# EXHIBIT A

```
                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK

In re:                              :
                                         Docket #24m2753
 UNITED STATES OF AMERICA,           :

                     Plaintiff,      :

   - against -                       :

 GOUDREAU, JORDAN GUY McDONALD,      : New York, New York
                                       July 30, 2024
                     Defendants.     :

------------------------------------ :

                    PROCEEDINGS BEFORE
                 THE HONORABLE GARY STEIN,
              UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:           UNITED STATES ATTORNEY'S OFFICE
                         BY:  GEORGIA KOSTOPOULO, ESQ.
                         One St. Andrew's Plaza
                         New York, New York 10007


For Defendant:           HANNAH McCREA, ESQ.

Also Present:            SPECIAL AGENT JACOB HAMILTON
                         FBI
```

Transcription Service:  Carole Ludwig, *Transcription Services*
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Email:  Transcription420@aol.com

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

<u>**INDEX**</u>

<u>**E X A M I N A T I O N S**</u>

| <u>**Witness**</u> | <u>**Direct**</u> | <u>**Cross**</u> | <u>**Re-**</u><br><u>**Direct**</u> | <u>**Re-**</u><br><u>**Cross**</u> |
|---|---|---|---|---|
| None | | | | |

<u>**E X H I B I T S**</u>

| <u>**Exhibit**</u><br><u>**Number**</u> | <u>**Description**</u> | <u>**ID**</u> | <u>**In**</u> | <u>**Voir**</u><br><u>**Dire**</u> |
|---|---|---|---|---|
| None | | | | |

1

2          THE CLERK:  In the matter of U.S.A. v. Goudreau.

3  Counsel, would you please state your name for the record,

4  starting with the Government.

5          MS. GEORGIA KOSTOPOULOS:  Good afternoon, Your

6  Honor, Georgia Kostopoulos for the Government, and I'm

7  joined by Special Agent Jacob Hamilton of the FBI.

8          THE COURT:  Good evening to you both.

9          MS. HANNAH McCRAE:  Good evening, Your Honor,

10  Hannah McCrae on behalf of Mr. Goudreau.

11          THE COURT:  Good afternoon to you, and good

12  afternoon to you, Mr. Goudreau.  Can I have the date and

13  time of arrest please?

14          MS. KOSTOPOULOS:  11:45 a.m. this morning, Your

15  Honor.

16          THE COURT:  Thank you.  Do you have the Rule

17  5(c)(3) affidavit in front of you, Ms. Kostopoulos, and

18  if so, can you put it in front of Agent Hamilton?

19          MS. KOSTOPOULOS:  Yes, we do, Your Honor.

20          THE COURT:  Great.  And has a copy been provided

21  to defense counsel?

22          MS. KOSTOPOULOS:  Yes, we've provided it to all

23  parties.

24          THE COURT:  All right.  Agent Hamilton, please

25  rise.  Can you raise your right hand?  Do you swear or

affirm that the contents of this Rule 5(c)(3) affidavit

are true and correct, so help you God?

AGENT HAMILTON: I do.

THE COURT: Could you please sign it?

(pause in proceeding)

THE COURT: And, Ms. Kostopoulos, if you can

hand it up, I will sign it as well.

(pause in proceeding)

THE COURT: All right, Mr. Goudreau, I'm

Magistrate Judge Stein. You're here because you've been

arrested on an indictment issued out of the Middle

District of Florida. The purpose of today's proceeding

is to advise you of certain rights that you have, to

inform you of the charges against you, to consider

whether counsel should be appointed on your behalf, and

to decide under what conditions if any you should be

released pending trial.

I'm first going to explain certain

constitutional rights that you have. You have the right

to remain silent. You are not required to make any

statements to the authorities. Even if you have already

made statements to the authorities, you need not make any

further statements. Any statements that you do make can

be used against you.

You have the right to be released pending trial, either with or without conditions, unless I find that there are no conditions that would reasonably assure your presence at future court proceedings and the safety of the community.

If you are not a U.S. citizen, you have the right to request that a consular officer from your country of origin be notified of your arrest. In some cases a treaty or other agreement may require the United States government to give that notice whether you request it or not. And I am required to explain this to you even if you are a U.S. citizen and it doesn't apply to you.

You have the right to be represented by an attorney during all court proceedings, including this one, and during all questioning by the authorities. You have the right to hire your own attorney, but if you cannot afford to hire your own attorney, the Court will appoint one to represent you. Do we have an application for appointment of counsel?

MS. McCRAE: Your Honor, I understand Mr. Goudreau has a retained attorney in this matter, and so I'm going to stand up for this proceeding, for the 5(c)(3), and then we'll take it from there if there's need for appointment. But I don't anticipate one in this

district.

THE COURT:  Okay.  Very well.

(pause in proceeding)

THE COURT:  All right, I have before me the arrest warrant and the charging instrument which, as I mentioned, is an indictment out of the Middle District of Florida.  You are charged in this indictment with several crimes, 14 counts.  Those include conspiracy to knowingly and willfully export and cause to be exported from the United States to Colombia defense articles without having obtained a license, as well as conspiring to knowingly and willfully export and cause to be exported from the United States to Colombia items on the Commerce Control List and without a license, and also conspiring to fraudulently and knowingly export and send from the United States certain merchandise, articles, and objects contrary to law and regulation.  That's count 1.

Additional counts charge you, in court 2, with smuggling goods from the United States, specifically lower bulk receivers.  Count 3 charges you with smugglings goods from the United States in the form of semiautomatic AR type firearms.  Counts 4 through 8 charge you with violations of the Arms Export Controls Act relating to items designated as defense articles on

the United States munitions list.  Counts 9 through 12

charge you with violations of the Export Control Reform

Act of 2018 and relate to items on the Commerce Control

list.  Count 13 charges you with violation of the

National Firearms Act in that you knowingly possessed

eight silencers.  Count 14 charges you with unlawful

possession of a machine gun, and that is the last count.

In addition, there's a forfeiture allegation in the

indictment seeking to forfeit property of yours involved

in the offenses.

     Ms. McCrae, have you received a copy of the Rule

5(1)(c) affidavit and the indictment and reviewed them

with your client?

     MS. McCRAE:  Yes, Your Honor.

     THE COURT:  Your client for purposes of today?

     MS. McCRAE:  Yes.

     THE COURT:  Does your client waive a public

reading?

     MS. McCRAE:  We do, Your Honor.

     (pause in proceeding)

     THE COURT:  Now, Mr. Goudreau, I'm required to

tell you that you may chose, if you wish, to be

prosecuted in this district, here in the Southern

District of New York, if you wish to plead guilty here

and waive trial in the Middle District of Florida, and if the U.S. Attorneys in both this district and in the Middle District of Florida approve the transfer. However, if you chose to plead not guilty or both U.S. Attorneys do not agree to let you proceed here, then you will need to go back to the Middle District of Florida for all further proceedings.  Ms. McCrae, recognizing that you're only standing in for today, does your client waive his rights under Rule 20 to be prosecuted in this district?

MS. McCRAE:  Yes, Your Honor.

THE COURT:  All right.  Mr. Goudreau, you also have the right to a hearing on the issue of whether you are the person named in the indictment.  Ms. McCrae, does your client waive his right to an identity hearing?

MS. McCRAE:  Yes, Your Honor.

THE COURT:  Now, in accordance with Federal Rule of Criminal Procedure 5(f), I remind the prosecution of its obligation under Brady v. Maryland and its progeny to disclose to the defense all information whether admissible or not that is favorable to the defendant, material either to guilt or to punishment, and known to the prosecution.  Possible consequences for non-compliance may involve dismissal of individual charges or

the entire case, exclusion of evidence, and professional

discipline or court sanctions on the attorneys

responsible.  Does the prosecution confirm that it

understands these obligations and will fulfill them?

   MS. KOSTOPOULOS:  We do, Your Honor,

recognizing, of course, that we're not the prosecuting

office, but we'll certainly convey the 5(c)(3) ordered

tendered by the Court to the Middle District of Florida.

   THE COURT:  Thank you.  All right, is there an

agreement with regard to detention or release pending

trial?

   MS. KOSTOPOULOS:  I believe there is not, Your

Honor.  The Government is seeking detention in this case.

   THE COURT:  And, Ms. McCrae --

   MS. McCRAE:  We are seeking release.

   THE COURT:  You're seeking release, all right,

very well.  Okay.  Let me ask Ms. Kostopoulos on what

grounds the Government is seeking detention?

   MS. KOSTOPOULOS:  Thank you, Your Honor.  We're

specifically seeking detention on several grounds.

First, under 18 U.S.C. 3142(f)(1)(E) for a felony that is

not otherwise a crime of violence that involves a

possession or use of a firearm.  Here, in addition to the

counts that charge the defendant with smuggling military

equipment and assault style rifles out of the United

States in connection with the attempted violent coup in

another country, count 14 specifically charges the

defendant with possession of machine guns. And then in

terms of the factors that weigh in favor of detention

here, under 3142(f)(2)(A) and (f)(2)(B), our position is

that there is both a serious risk that the defendant will

flee and that he will obstruct or attempt to obstruct

justice as well as a danger to the community. And I'm

happy to be heard on each of those grounds.

          THE COURT: All right. Okay, this is not a

presumption case though?

          MS. KOSTOPOULOS: It is not, Your Honor, no.

          THE COURT: Okay. All right. Mr. Goudreau, as

I mentioned before, I am required under the law to

release you either with or without conditions imposed

unless I determine, and the Government is asking me to

make this determination, that there are no conditions

that will reasonably assure your appearance in court as

required and ensure the safety of the community. You

just heard the Government lawyer explain the grounds on

which it is seeking detention. I'm going to listen both

to the Government's lawyer and to Ms. McCrae on that

issue. In making this determination, I'm required to

consider several factors including the nature and

circumstances of the offense charged, the weight of the

evidence against you, your history and characteristics,

and the nature and seriousness of the danger to any

person or the community that would be posed by your

release.

Now, in this case it is the Government that

bears the burden of establishing either by clear and

convincing evidence that there are no conditions that can

ensure the safety of the community or by establishing by

a preponderance of the evidence that there are no

conditions that can ensure your appearance as required.

All right.  So I'll now hear from the Government.

MS. KOSTOPOULOS:  Thank you, Your Honor, and I

recognize that we're beginning somewhat late in the

evening, but this case has a complex history and in

particular I think has a number of facts that wouldn't

have been know to Pretrial but I think weigh heavily in

favor of detention here.  And so I just want to go

through and outline each of them step by step for the

Court.

So, first, I'll start perhaps with the most

obvious which is the nature and circumstances of the

offenses.  This is extremely serious conduct that the

defendant is charged with.  This is a sophisticated

scheme that's a 14-count indictment to export military

grade equipment, firearms, laser sights, and night vision

devices, military grade equipment, in order to be used in

an armed incursion in Venezuela.  That armed incursion

was unsuccessful, but it resulted in the deaths and

imprisonment of two former Green Berets, and it was

conducted without licenses, without authorization.

Essentially, the defendant was part of a group of

individuals that sought to smuggle these extremely

dangerous and highly regulated forms of equipment and

firearms into Colombia.

         With the Court's permission, I'd like to

approach, and I've provided photographs to defense

counsel as well of some of the equipment that was

recovered in Colombia that are basis of the charges

because I think they help shed light on the significance

of the charges against the defendant and the volume of

equipment that was smuggled by the defendant in

connection with these charges.  And defense counsel has

seen a copy of this.

         THE COURT:  You may approach.

         (pause in proceeding)

         MS. KOSTOPOULOS:  So just flipping through the

pages, Your Honor, you'll note that there are numerous

images of various guns, rifles, ammunition, night

goggles, laser sights, and other military equipment and

ammunition that were recovered in connection with the

charges brought against the defendant. And as a result

of that, the defendant is facing extremely serious

penalties, a 20-year maximum sentence for the exports

related violations and a 10-year maximum for the

smuggling of firearms and silencers, some of which are

photographed in the exhibits we've provided to the Court.

THE COURT: Is there a mandatory minimum?

MS. KOSTOPOULOS: There is not a mandatory

minimum, Your Honor, no. The second factor that weighs

heavily in favor of detention here is the weight of the

evidence. As noted in one of the exhibits before, Your

Honor, the defendant's DNA was recovered on one of the

machineguns that was sieved in Colombia. I believe

that's exhibit J. I've provided now both of my copies to

defense counsel and the Court. But one of the pages

includes a photograph of the machinegun from which the

defendant's DNA was collected. There are order

confirmations and text messages reflecting the

defendant's purchase of these control items. There's

testimony anticipated from witnesses who participated in

this scheme with the defendant.

        And, frankly, Your Honor, and this will be a
theme when we talk about the flight risk, extremely
incriminating, Google search history.  So, for example,
will I lose my VA benefits if I'm indicted?  How do you
prove export of weapons?  Smuggle guns crimes, and how do
you prove gun smuggling?  The defendant was aware at
least in 2020 based on press coverage that he was
investigated for this conduct, and as we'll note later
when we talk about the risk of flight, he took a number
of steps to research how he could evade law enforcement,
how he could go off the grid, and what steps he would
need to take in order to not end up in this courtroom,
frankly, today.  And that's --

        THE COURT:  Could you just repeat the timing of
what you said about when the defendant was aware he was
under investigation?

        MS. KOSTOPOULOS:  So our understanding, Your
Honor, is that there was press coverage both about this
failed military operation as well as the defendant's
potential involvement in smuggling some of the equipment
that was ultimately the basis of these charges in May of
2020.  And at that point law enforcement obtained Google
search history from the defendant's accounts, various

electronic accounts associated with the defendant that
show that he was not only repeatedly monitoring news
coverage of the investigation into his misconduct, but
also, as we'll talk about later, Googling and searching
extensively for how he could evade law enforcement, how
he could flee from the United States, what countries he
could seek asylum in, and how he could be, just to
provide an example, a sophisticated fugitive.  That was
one of the searches and articles that the defendant
reviewed in May 2020 after this investigation at that
time became public.  So that's a significant --

             THE COURT:  I don't mean to --

             MS. KOSTOPOULOS:  Of course.

             THE COURT:  -- interfere or get ahead of where
you are in your presentation, but in addition to the
Googling about things he could do, did he do any of those
things?

             MS. KOSTOPOULOS:  He did, Your Honor.  So in, at
some point between, and I don't believe that we know the
specific date for reasons I'll explain, but at some point
between 2020 and 2024, our understanding is that the
defendant started to take steps to essentially move his
online presence off the grid.  And one of the things that
he did was travel illegally to Mexico without using sort

of customary channels that would've identified his travel

to law enforcement.

And so what law enforcement recovered

specifically was a receipt of travel showing that the

defendant had illegally entered and returned from Mexico,

but there was no record of his travel associated with his

passport.  And there are internet searches that the

defendant conducted at around the same time as some of

these searches that I mentioned before where he was

essentially looking for how he could travel into and out

of the country without being detected which is precisely

what the visa receipt that was located by law enforcement

seems to suggest, essentially how can I travel south to

Guatemala illegally.  That's one of the searched the

defendant ran.  How can I ride the beast Mexico south to

Guatemala?  That was another search that the defendant

ran.  How to bypass the Darién Gap.  That was another

search that the defendant ran.  Best place for asylum.

Apply for political asylum.  These were all steps the

defendant was taking when he learned that he was under

criminal investigation for this conduct, and now that

those charges have been unsealed and brought against him,

frankly, Your Honor, they're proof positive that the

defendant has the means and the willingness to engage in

2   precisely the type of risk of flight that's

3   (indiscernible) 3142(f).

4              Some of these searches --

5              THE COURT:  But of course he's here.

6              MS. KOSTOPOULOS:  He is, Your Honor, but there

7   are additional steps that he has since taken in order to

8   evade law enforcement.  And so I understand in his

9   Pretrial interview the defendant claimed that he's been

10  living openly in the United States, living in New York,

11  living with his partner or his girlfriend.  According to

12  my conversations with the Middle District of Florida as

13  well as the law enforcement agents who were tasked with

14  arresting the defendant, and this is consistent I think

15  with the searches the defendant was running at the same

16  time, the defendant stopped updating his DMV records.  He

17  told his vehicle.  He started running searches on the

18  dark web for how to avoid having his bank accounts be

19  tracked.  He started searching for forms of

20  cryptocurrency that can't be traced or that are

21  untraceable.

22             And each of these steps, Your Honor, according

23  to the Middle District of Florida and the FBI who were

24  tasked with arresting the defendant made it extremely

25  difficult to locate him.  So while the defendant may

claim that he was living openly in New York, there were

numerous signs that the defendant was taking steps to

avoid a public, sort of a public identity, that he was

trying to make it difficult to locate where he was

living, that at various points he was not, in fact,

living in New York, that he had traveled internationally,

and that he was researching essentially when he believed

he was under investigation, and there was a risk that he

was going to be arrested, that he was researching how to

escape and how to avoid both being caught by law

enforcement and also how he could travel without being

detected by law enforcement.

THE COURT:  Where was he arrested?

MS. KOSTOPOULOS:  He was arrested here in New

York, Your Honor.

THE COURT:  Where?

MS. KOSTOPOULOS:  He was arrested I believe at

the residence associated with his girlfriend.  And so I

believe that law enforcement was surveilling the

location, the residence that they had identified and

ultimate identified him.

THE COURT:  And the indictment was issued

relatively recently, right?

MS. KOSTOPOULOS:  I'm sorry?

1

2    THE COURT:  The indictment was issued relatively

3 recently?

4    MS. KOSTOPOULOS:  It was, Your Honor, it was

5 issued earlier this month I believe.  Perhaps a week ago.

6    THE COURT:  Were there efforts to arrest him

7 that came to naught because he was difficult to find?

8    MS. KOSTOPOULOS:  I'm not aware of whether

9 between the time that an arrest warrant was issued and

10 the arrest that ultimately was conducted today law

11 enforcement took other steps, but what I do know is that

12 when law enforcement, as I represented to Your Honor

13 based on my conversations with the Middle District of

14 Florida and with the arresting agent, at points when they

15 were attempting to detect where the defendant was living,

16 what his pattern of life was, his bank account activity,

17 his DMV records, his vehicle, all of these markers that

18 would allow him to be more easily detected and

19 identified, each of these had essentially been erased

20 from the defendant's public identity.  He had sold his

21 car, he had moved his bank accounts into various forms of

22 cryptocurrency, essentially making it more difficult for

23 him to be found by law enforcement, and, frankly, Your

24 Honor, precisely in line with the searches that law

25 enforcement identified that the defendant was running in

2020 when these charges or at least this investigation
first became public.

          The difference, Your Honor, and I know, you
know, we're talking about searches that occurred in 2020,
there's a significant difference now.  The defendant has
been arrested.  He's been charged with extremely serious
criminal charges that face very significant penalties.
And as the photographs before Your Honor demonstrate,
this is for smuggling hundreds of rounds of ammunition
out of the country, military grade equipment out of the
country, assault style rifles out of the country.  And so
not only does that demonstrate access to firearms and
knowledge of firearms, it also demonstrates that the
facts now have changed.  We're not talking about the
hypothetical where the defendant is researching, you
know, what countries he can flee to or what countries he
can seek asylum to; the reality is he is now facing
extremely serious penalties, and that's precisely the
type of risk of flight that the evidence in this case
demonstrates is more likely than not, that's the
evidence, that's the burden that the Government bears in
terms of showing that there is a risk of flight here for
this particular defendant.

          I think, Your Honor, two, maybe three other

points to quickly, to conclude on in terms of the danger

to others and, frankly, just the danger writ large in the

offense conduct here.  One, this crime involved weapons.

There were weapons that were being procured and illegally

smuggles out of the country by the defendant in order to

support an armed incursion against a foreign government.

That is intrinsically violent conduct that the defendant

was seeking to engage in and that he was taking steps to

participate in and facilitate others' engagement in.

Second, access to weapons, and I think

specifically, Your Honor, here, some of the search

history from the same time period when the defendant was

searching how he could exit the country without being

seen by law enforcement, some of the searches he was

running, how to get a pistol through a metal detector, X-

ray scanner hide pistol images.  Hide pistol X-ray.  Is

it possible to sneak a gun through airport security?

These are precisely the kinds of searches that

demonstrate that the defendant had access to firearms and

that he can't be trusted, frankly, to abide by a court

order as Pretrial has recommended that he not continue to

possess firearms or use firearms, if for some reason he's

released on conditions.

THE COURT:  Was he prohibited from possessing a

firearm?

MS. KOSTOPOULOS:  He's not, Your Honor, but I believe that that's one of the conditions that Pretrial is noting.  It's not that the defendant is prohibited from having a firearm whatsoever; the bigger concern is that in taking steps to evade law enforcement and Googling how or searching for how he could evade law enforcement, he was also searching about how he could conceal a weapon illegally and travel through airport security or get on a bus to Mexico without it being known that he was carrying a firearm that he would not have been permitted to travel with, for example, passing through an airport.  That's what I think is implicit in the searches the defendant seems to have been running at the same time that he was searching for countries to flee to and how to be a, how to essentially become a fugitive.

The final note, Your Honor, that I think weighs heavily in favor of detention here, obviously the primary basis that we're arguing for is risk of flight.  I've highlighted some of the danger to the community and just general danger that's sort of part of the offense conduct here and part of the charges against the defendant.  The final thing I think to note is that part of the allegations against the defendant and my understanding

from speaking to the Middle District of Florida is that

the defendant has, since the investigation became public

or at least since it was in the press, tried to contact

at least one witness in connection in this investigation

and essentially coach that witness on what to say if

approached by law enforcement and specifically advised

the witness to lie to law enforcement if the, if law

enforcement were to reach out to this individual and ask

about his involvement in this, in these charges, in this

particular case.

        And so that weighs heavily under the 34, 3142(f)

factors and specifically the risk that a person will

obstruct or attempt to obstruct justice.  There's a risk

that the defendant will flee, he was taking active steps

to research how to flee, he was taking active steps to

evade law enforcement after he believed, I think, that he

was in the clear and that he was no longer under

investigation, and he's also taken steps to contact

witnesses in connection with the investigation.  And for

all those reasons, Your Honor, we believe detention --

        THE COURT:  You just said witnesses.

        MS. KOSTOPOULOS:  Witness, excuse me, singular.

One witness in connection with this investigation.  And

so for all of those reasons, Your Honor, we believe

detention is necessary here and that no condition or

combination of conditions will both assure the

defendant's continued presence in connection with this

case, will prevent him from fleeing, will adequately

protect the community, and will avoid the concerns

regarding obstruction of justice and witness tampering.

THE COURT:  The indictment charges a conspiracy

ending I guess in around March of 2020.  Is that when the

incursion happened?

MS. KOSTOPOULOS:  I believe – one moment, Your

Honor, I can check with the case agent.  I believe it

happened sometime in 2020.  I'm not sure of the exact

month.  I believe it was in May 2020 which is also when

many of these searches were being conducted after the

incursion.

THE COURT:  Searches of his internet history?

MS. KOSTOPOULOS:  Yes, so I believe that the

timeline was smuggles weapons out of the country,

participate in this, you know, failed incursion in

Venezuela that led to several deaths and several being

imprisoned, and then there began to be press coverage

about the incursion and the defendant's role in it, and

specifically that the defendant may have been one of the

people who smuggled this military equipment out of the

country, and that's when we start to see sort of lengthy

- I have them here, Your Honor, I mean it's pages and

pages of searched where the defendant is looking at news

of the coverage and searching for how to flee the country

and countries to seek asylum in.

THE COURT:  In 2020?

MS. KOSTOPOULOS:  In 2020, yes.

THE COURT:  And do you have any indication that

he's continued to engage in the same or similar criminal

conduct as what's alleged in the indictment since May of

2020 or other criminal conduct?

MS. KOSTOPOULOS:  I have no evidence one way or

another, Your Honor.  Again, you know, we're sort of

relying on the proffers and the, both the proffers from

the Middle District of Florida and the charges that are

outlined here.  I have no evidence one way or another of

whether there's been any, both ongoing involvement or

whether there's been investigation or if the

investigation is ongoing.

THE COURT:  Thank you very much.  Ms. McCrae.

MS. McCRAE:  Yes, Your Honor, so we do believe

that there are conditions that can be fashioned here for

releasing Mr. Goudreau.  I think as the Court is

gathering and the Government has put forth, this case has

2   a lengthy history, there's a lot going on here, extremely

3   highly publicized incident that happened in Venezuela

4   that Your Honor may remember himself.  I can fill the

5   Court in a little bit more on what's been happening on

6   Mr. Goudreau's side since the media coverage surrounding

7   this case in 2020 arose.

8             Mr. Goudreau had, he did retain private counsel

9   in Florida in connection with the investigation in this

10  case.  He knew that he was under some sort of

11  investigation.  I did have a chance to speak with his

12  retained counsel earlier today.  I can give the Court

13  that person's name if the Court would like.

14            THE COURT:  Sure.

15            MS. McCRAE:  His name is Gustavo Garcia- Montes.

16  He's a Miami-based lawyer.  And there was extensive

17  communications with the Government, agents, and I believe

18  even the U.S. Attorney's Office at the time.  There was a

19  scheduled meeting with the FBI that Mr. Goudreau had

20  consented to.  It was apparently scheduled for a Friday.

21  He was planning to attend it.  And then on a Thursday the

22  agents decided to execute a warrant on him and decided

23  not to proceed with that meeting.  Despite that --

24            THE COURT:  When was that, do you know, like the

25  year?

MS. McCRAE:  That was in 2020, but I don't know
more precise than that.  And subsequent to that he,
nevertheless, at the request of the Government,
voluntarily turned over a phone that I believe they have
and they have searched.  He has stayed in touch with
private counsel; private counsel has continued to be
available to work on this case.  And essentially, after
events of the early part of this investigation died down,
he waited, and he didn't hear anything, and nothing else
happened.

Since then, about two and a half years ago, it's
correct that he relocated to New York, and he's been
living in Manhattan with his partner at the same address
for the entire time.  He has been attending film school
here in New York.  He has been attending the --

THE COURT:  Enrolled in his own name?

MS. McCRAE:  I'm sorry?

THE COURT:  Enrolled in his own name?

MS. McCRAE:  All in his own name, yes, correct,
Your Honor.  And I should add, Your Honor, the military
is paying for him to go to school.  He's also collecting
a military pension.  He attends a VA here for medical
treatment.  I think the Court may be aware he's military,
he's a retired, I believe he was Special Forces before he

2  was medically retired.  He suffers from quite a few

3  injuries from his time in combat, and I can list some of

4  those for the Court, but they include, you know, a TBI

5  from blast injury, multiple gunshot wounds, multiple stab

6  wounds, PTSD.  So there are substantial medical concerns

7  for which he's been receiving regular treatment from the

8  VA here in Manhattan, and I point that out so the Court

9  can see just how openly he's been living.

10         And like I said, he's been living at the same

11  address with his partner where he was arrested today.  So

12  there's no indication whatsoever that he's not living an

13  open life.

14         I should also add he frequently travels back to

15  Florida to, yeah, Tampa where he often resides, and when

16  he's in Florida, he lives on a boat that is docked at an

17  air force base.  In order to get on and off the base, he

18  shows an ID, he comes on and off the base.  He frequently

19  flies back and forth to Florida using his own ID.

20         You know, the Government made several

21  representations about him going to Mexico and somehow

22  suggesting that was surreptitious.  You know, Mr.

23  Goudreau has not traveled much in the last five years,

24  but I understand he did travel to Canada last year to see

25  his mother who was gravely ill, and she did, in fact,

2   pass away.  He did that using his own name.  He obviously

3   came back into the country, and for that matter all these

4   trips he came back into the country.

5          So what I'm trying to get at here, Your Honor,

6   is he's been living openly, absolutely no effort to

7   conceal where he's at and his identity who he is.  He's

8   very much on the military's radar because he's attending,

9   you know, school on the GI bill and going to the VA for

10  medical treatment.

11         Your Honor, he – my understanding is this case

12  was indicted about two weeks ago, and neither Mr.

13  Goudreau nor his lawyer can tell us why it was indicted

14  when it was indicted.  Our best guess is that the

15  Government is nearing its statute of limitations.  I

16  should add, by the way, the private counsel informed me

17  that when this case began it began as a FARA

18  investigation.  So the nature of it was a little bit

19  different, but I recognize the charges before the Court

20  are not FARA charges.  But he was indicted two weeks ago.

21  He was not told he was indicted.  It's not though anyone

22  called him or his lawyer and gave him an opportunity to

23  appear in Tampa which he certainly would have done.

24         You know, I think it's significant for the Court

25  to know his co-defendant was apparently given that

opportunity.  She was notified and told to appear.  So to

the extent that the nature of the charges or the amount

of his jail exposure here and of itself a flight risk.

You know, the Government apparently didn't see that to be

the case with the co-defendant.

So, you know, based on the fact that he's

retained counsel, he was historically very cooperative on

this case, he's been living openly, I just, I really

don't see how the Government can make out flight risk.

Your Honor, a couple of other things, you know,

we're definitely not here to litigate the substantive

allegation, and I would not attempt to do that, but, you

know, basic media coverage, like sort of Google searching

about the incident back when this happened, one thing I

want the Court to be aware of is there was a request for

extradition from Venezuela shortly after this happened

for Mr. Goudreau, which I understand the U.S. government

ultimately declined to honor, they did not, as the Court

can perfectly well see, extradite him at Venezuela's

request.  But I think that goes to why he may have been

done some searches about, for example, asylum in

countries and things like that.

But as the Court has pointed out, his search

history is now, you know, well over four years old.

There's no indication whatsoever that he's done anything

to even remotely try to flee or evade detection by the

U.S. government.  If I could just have a moment.

(pause in proceeding)

MS. McCRAE:  Your Honor, I will say that he,

like I said, he lived with his partner for two and a half

years.  She is here in the courtroom, here in the second

row.  You know, I think this is the kind of case where I

don't think detention is appropriate given everything

that's happened in the last few years.  If the Court

detained him, he would go to MDC which we all know is not

a good place, particularly if someone needs medical care

of any kind.  And it might --

THE COURT:  Temporarily.

MS. McCRAE:  I'm sorry?

THE COURT:  Quite temporarily.

MS. McCRAE:  Well, I'm about to address that.

In my experience he could sit there for weeks waiting

transfer to the Middle District of Florida or the Court

could release him and tell him to appear on Friday, and

he would do that.  And I think there's no reason to think

he wouldn't, and there's no reason to think the Court

can't fashion, you know, conditions that would make that

possible.

He has a place to go, he has the place he's been living.  If the Court wants him to be under detention there until he gets, you know, on a plane to Florida, that can be arranged.  We also are able to sign a bond. His partner who's in the courtroom has indicated to me that she owns outright an apartment.  It's valued at $2 million, Your Honor, and that is something that she would be willing to --

THE COURT:  Equity of 2 million?

MS. McCRAE:  My understanding, yes.  Post as a guarantee that Mr. Goudreau would not flee.  And I understand given the nature of a 5(c)(3) that it requires traveling to Florida, perhaps a high bond is more appropriate than like something like home detention because the whole idea is that he goes to Florida.

So, you know, I think that the Court, given that he has a cosigner who's willing to sign, he, you know, has a place that he routinely stays which is the boat that's on the Air Force base in Florida, and the fact that he can just get on a plane and go there himself rather than waiting in, you know, frankly, an appalling jail while the Government seeks to transfer him which can take a very long time is a more appropriate course of action given that he's just been living openly here for

the last few years. If I could just have one moment.

THE COURT: Any other individual you've identified as potential cosigners?

MS. McCRAE: No, Your Honor, not at this time. Although, of course, Mr. Goudreau himself can sign, and he does earn money. Well, actually it's about $10,000 a month right now from the military that he's reported to Pretrial. That's a combination of his retirement disability benefits and income he receives as being a student on the GI bill.

THE COURT: Is there anyone else who has, in the United States who has some degree of moral suasion, family member, something like that?

MS. McCRAE: I can ask, Your Honor. If you want to give me a moment.

THE COURT: Sure.

MS. McCRAE: I'm not sure we'd be able to like rustle up their names right now in real time, but I can certainly ask Mr. Goudreau. But, again, this isn't the kind of case where we're seeking an unsecured bond. This is --

THE COURT: Understand.

(pause in proceeding)

MS. McCRAE: We have at least one good friend

who we're quite confident would sign.  He's one of his

oldest friends from the military.  He resides in

(indiscernible) so we would have to touch base with him

to coordinate with the U.S. Attorney's Office.  And,

again, you know, any other conditions the Court imposes

including, you know, sending Pretrial his itinerary.  If

Pretrial is okay with it, he could be on an ankle monitor

and surrender the ankle monitor to Pretrial in Florida.

You know, whatever the Court would want as security, I

just think he could get himself there much more safety

and much more quickly and much more in compliance with

the Bail Reform Act if he were released.

THE COURT:  Thank you.  Anything further from

the Government?

MS. KOSTOPOULOS:  Yes, Your Honor, just briefly,

a couple of points.  I think, first, the statement by

defense counsel that, you know, once the defendant became

aware that there might be in an investigation against him

or involving him in 2020, he just waited and lived

openly, that's not correct, Your Honor, that's not

accurate.  I think the internet searches demonstrated

that that's not what the defendant was doing, that he was

taking steps to research what he should do if he became

aware of the fact that law enforcement would try to

either bring charges against --

THE COURT:  How do you know about those, by the way?  Is that from searching the cellphone that he surrendered voluntarily?

MS. KOSTOPOULOS:  I'm not sure where – I can check with the case agent where these searches came from, Your Honor, but my understanding is that they're either associated with his electronic accounts or I believe devices that were collected in connection with this warrant that was mentioned by defense counsel in 2020. So which of the two these specific searches came from I'd have to confirm, but the searches I think demonstrate precisely what animates the Government's application for detention here which is not that this was some sort of hypothetical or a one-off search that the defendant engaged in but that there were repeatedly dozens of searches that the defendant was conducting about how to live off the grid, what countries he could flee to, how he could avoid law enforcement, what happens if he runs from the law, I mean --

THE COURT:  But he didn't do that, and I have to consider, if there are conditions that can address that risk of flight to whatever extent it exists, I am obligated to impose those conditions rather than detain

this gentleman.

MS. KOSTOPOULOS:  I recognize that, Your Honor,
but I think that the key factor here, what has changed is
that the defendant has now been charged, and so this is n
longer the hypothetical risk of charges, the hypothetical
investigation that was being reported in the news.  These
are actual criminal charges where the defendant is facing
as a maximum penalty between 10 and 20 years in prison.
And those are precisely the types of penalties that the
defendant presumably was considering how he would evade
when he was searching what countries he could flee to or
how he could leave the country without being detected by
law enforcement.

And some of those searches, frankly, Your Honor,
I think, you know, there's some lack of clarity here
about where the defendant has been living, and I think
this is sort of belied by defense counsel's proffer, you
know, our understanding is that certainly that he owns a
boat in Florida that he uses to travel, that he was
living at least part time in New York, but it sounds like
he was living in Florida as well.  He has very limited
ties to the community in terms of individuals who can
actually exercise moral suasion over him here in New
York, here in the Southern District to make sure that he

actually travels to the Middle District of Florida. And,

frankly, Your Honor, even the reference to the sailboat,

I mean one of the searches the defendant was running was

can I take a boat with no passport? What happens if I

run from the law? I mean these are precisely the types

of tools that the defendant was thinking about and

seeking to use in order to evade law enforcement when he

believed that he was about to be imminently arrested.

The press coverage of that event changed, there was no

longer sort of coverage about the event, and he started I

think to believe that he was no longer at risk of being

charged and arrested. But now those facts have changed

on the ground, Your Honor, and that's a significant

factor weighing in favor of detention here.

He's shown that he is sort of interested and

willing to research how to take steps to evade law

enforcement, and that's a very significant step forward

now that he's actually been charged.

THE COURT: Well, he wouldn't be here if he

wasn't charged.

MS. KOSTOPOULOS: Here in this courtroom.

THE COURT: Yes.

MS. KOSTOPOULOS: Absolutely, Your Honor. I

recognize that, you know, and I do think on that note --

2              THE COURT:  The existence of charges I suggest

3    can't have such a big impact as you suggest.

4              MS. KOSTOPOULOS:  I think, Your Honor, though --

5              THE COURT:  I can't view it that way at least.

6              MS. KOSTOPOULOS:  Sure.  I think that the point

7    though that I'm trying to make is the following.  When

8    the defendant did not know that he was about to be

9    charged and only knew of the existence of a potential

10   criminal investigation involving his illegal conduct, he

11   was taking extensive efforts to research what he should

12   do in order to evade law enforcement and flee the

13   country.  Those charges didn't come to fruition at that

14   time.  Apart from illegally traveling to Mexico, as we've

15   proffered to the Government, he has otherwise, as we

16   understand it, largely stayed within the United States,

17   but what's changed now is that that's no longer, that's

18   no longer a hypothetical --

19             THE COURT:  But what will also change is that,

20   if I decide to release him, he will be under significant

21   conditions.

22             MS. KOSTOPOULOS:  But our argument, Your Honor,

23   is that no combination of conditions, given that there's

24   evidence here that the defendant was able at least once

25   to illegally leave the country, travel over the border to

Mexico, and return without being checked by customs,

without being registered at the border, and that he was

researching precisely how to do that at the time that we

believe the travel took place, that's a significant step

forward to actually evading law enforcement, and it shows

that he has the means and the ability to do so.

             THE COURT:  Anything else?

             MS. KOSTOPOULOS:  No, Your Honor.

             THE COURT:  All right.  I've listened very

carefully to the arguments of both sides.  I've also

carefully read the Pretrial Services report which does

recommend release based on a number of conditions set

forth therein.  And I believe that there are conditions

that I can impose that will in combination reasonably

assure Mr. Goudreau's appearance in court which is the

principal argument on behalf of the Government but also

will protect the safety of other persons in the

community.

             I don't believe the Government has met its

burden of showing that Mr. Goudreau is a, either a

significant risk of flight or danger to the community or

presents a danger of engaging in obstructive conduct that

cannot be sufficiently addressed by conditions on his

release, which will be significant.  But this is not a

presumption case.  There's no mandatory minimum although

the charges are quite serious, and I'm sure Mr. Goudreau,

if convicted, faces some significant time in prison.  But

he has – that conduct ended a number of years ago.

There's no evidence before me that he's engaged in any

additional criminal conduct before then or after then.  I

apologize, it's difficult for me to assess the weight of

the evidence to be honest.  I appreciate the Government

lawyer's filling in some of the record which is not

evident, of course, from reading the indictment, but,

nevertheless, I don't view that factor as compelling

detention in this case.

Mr. Goudreau I believe has no criminal history.

He's been here in the United States for a long time.  He

has a long-time relationship.  There are financial

conditions that I intend to impose that should further be

a very significant disincentive for him to violate those

conditions because in so doing he would be hurting

people, at least among the people he holds most dear.

I've listened carefully to the Government's

proffer about search history from 2020.  It is a concern,

and it will result in the imposition of conditions at

least by me that I would not otherwise have imposed, but

given that that was many years ago and from everything

the Government has said and from Mr. Goudreau's presence

here today, he did not act on whatever thoughts he had

back then that may be gleaned from those searches.  He

has, as has been represented to me, he's cooperated with

law enforcement.  He has lived openly.  I'm not persuaded

by the Government's somewhat I thought obscure and vague

insinuations that he has been trying to hide in recent

years.  It sounds like the Government had no difficulty

in finding him once an arrest warrant was issued.  He's

been using his own name.  There was I believe zero

evidence proffered to me that he's used any aliases or

anything of that nature.

        Although the crime is certainly involves

violence on a very tall order, there is no indication

either from the circumstances of those offenses or

anything else in Mr. Goudreau's records that suggests he

has been a danger to anybody here in this community or in

the United States as far as the record appears to me at

least.  And that's not in any way to minimize the

seriousness of arms smuggling and export violations if

that conduct was engaged in, but obviously Mr. Goudreau

will need to remain here, addressing the dangerousness

issue now.  He will need to remain in the United States.

So, and as I said, I don't think he poses a significant

threat to anybody in terms of dangerousness in the United

States, and he won't be in a position to pose a threat

to, a significant threat to anybody outside of the United

States.

So for all those reasons I am going – and let me

just say I believe that under the law I'm required to

release him because I believe there are conditions that

will assure the safety of the community and his

appearance at future court proceedings, but obviously

once he arrives in the Middle District of Florida, that

issue will be revisited, Mr. Goudreau, and the good

judges down there may have a different point of view.

Maybe another fight.  I can only call it the way I see

it, and the way I see it, there are conditions that I can

impose.  Those conditions are as follows:

Mr. Goudreau must sign a $2 million bond.  That

is to be cosigned by two financially responsible persons

and secured by the apartment – apartment? – owned by his

girlfriend.  I think we have her name please.

MS. McCRAE:  Your Honor, may I (indiscernible).

I'm happy to approach and tell the Government at least

written in a report.  I would just rather not be on the

public record.

THE COURT:  Uh huh, well.

1

2          (pause in proceeding)

3          MS. McCRAE:  It's not in the Pretrial report.

4   I'm happy to tell the Court what it is.

5          (pause in proceeding)

6          MS. McCRAE:  Your Honor, I'm not sure – her name

7   and number were certainly shared with Pretrial.  Perhaps

8   they did not include it in the report.  Oh, yes, it is

9   there, Your Honor, it's on page 2, second paragraph from

10  the bottom, second to last line.

11         (pause in proceeding)

12         THE COURT:  Okay, I see it.  I can't make any

13  promises about keeping her name out of the public record

14  though.  Obviously, if she's going to be a cosigner.

15         MS. McCRAE:  Would Your Honor be willing to make

16  it so that the partner signs it but the second signer is

17  moral suasion.  I'm just not sure, I'm concerned about

18  the amount of money, whether the second person would be

19  approved as a cosigner given the amount.  Like it's a

20  secured bond with respect to his partner's apartment, but

21  a lot of cosigners would not get approved at that amount.

22  So for the second cosigner --

23         THE COURT:  Well, in my view that is a moral

24  suasion person, that's what that person brings to the

25  table.

1

2          MS. McCRAE:  Then perhaps we could just clarify

3 it's to be signed by Mr. Goudreau and his partner and

4 secured by her apartment and then another cosigner who's

5 a moral suasion --

6          THE COURT:  Yes.

7          MS. McCRAE:  We just clarify that those are the

8 terms.  I'm just not --

9          THE COURT:  Yes, but they'll be signing a $2

10 million bond.

11          MS. McCRAE:  Okay.

12          THE COURT:  But from my standpoint and for

13 whatever it's worth in terms of the Government's

14 consideration of that person, you know, I believe that

15 that person has the requisite degree of moral suasion

16 having the financial wherewithal to cough up 2 million

17 bucks is not necessary.

18          MS. McCRAE:  I just want to be in a position

19 where they can't get approved for a bond of

20 (indiscernible).

21          THE COURT:  Mr. Goudreau is to be subject to

22 Pretrial Services supervision as directed.  Travel is

23 restricted to the Southern District of New York and the

24 Eastern District of New York.  Obviously, that is subject

25 to his not only ability but obligation to travel to the

Middle District of Florida for court appearances and

places in between that it's necessary to get to the

Middle District of Florida.  He shall surrender all

passports or other travel documents and make no new

applications for passports or travel documents.  I am

going to order home detention with GPS monitoring or

monitoring as decided by Pretrial Services.

PRETRIAL SERVICES:  Yes, Your Honor, we would

recommend as directed --

THE COURT:  As directed by Pretrial Services.  I

defer to my friends in Pretrial Services.

MS. McCRAE:  I'm sorry, so that's not home

detention?

THE COURT:  No, that is home detention.  And,

again, obviously my role here is perhaps of an interim

nature.  That may be revisited by the Middle District of

Florida and perhaps (indiscernible) depending on if Mr.

Goudreau seeks that, and a court approves it.  But I

believe that at least for present purposes home detention

is warranted.

Mr. Goudreau is to continue with his educational

program.  He shall submit to an initial urinalysis, and

if that is positive, he will be subject to drug testing

and treatment as directed by Pretrial Services.  He will

be subject to mental health evaluation and treatment as
directed by Pretrial Services.  He is to have no contact
with codefendants or any witnesses in this case unless in
the presence of counsel.  Okay?  That means no contact of
any nature, not just contact about the case, no contact
with witnesses or codefendants or alleged coconspirators
in this case.

He is to refrain from possessing any form of
firearm, destructive device, or any other dangerous
weapon, and – (pause) – I will require these conditions
to be met prior to his release, including the posting of
the apartment.  So that means, Mr. Goudreau, that you
will not be released today because there's no way that
that could happen today.  Okay?

MS. McCRAE:  Would the Court reconsider that
portion?  I mean he would report here first thing.  I
understand the time of day and that's the problem that
we're having, but I think --

THE COURT:  Well, it's not just the time of day.
It may take some time to get the other cosigner in to
post the property.  Pretrial has recommended that these
conditions must be met before he is released, and I am
accepting that recommendation.  And, of course,
encouraging the Government, as I would expect in any

event, to cooperate fully and promptly with whatever it

needs to do to enable Mr. Goudreau to satisfy those

conditions.

(pause in proceeding)

THE COURT:  Anything further on the conditions

of release?

MS. McCRAE:  Nothing from me, Your Honor.

MS. KOSTOPOULOS:  Nothing on the conditions of

release, Your Honor.  I think we have one further point

we'd want to make, but I don't want to interrupt the

Court if you're outlining additional conditions or had

other items you wanted to address.

THE COURT:  I was done with outlining the

conditions, so go ahead.

MS. KOSTOPOULOS:  So I recognize that this may

be in part mooted, Your Honor, by the Court's order that

the defendant be required to satisfy the conditions prior

to being released, but the Government would also

respectfully request a 24-hour stay in order to give the

Government an opportunity to consider whether, and I

believe specifically to give the Middle District of

Florida time to consider whether or not there are any

additional steps they wish to take in light of Your

Honor's rulings regarding the conditions of the

defendant's ultimate release.

THE COURT:  I really do think it's moot, which you could say cuts in favor of granting that request as well because I don't think it'll make a difference.  Do you have a position, Ms. McCrae?

MS. McCRAE:  Your Honor, I would ask the Court to deny that motion and also because I don't understand the Bail Reform Act authorizes stay on a bail position. That's usually why we go straight to Part 1 the day of when the Government seeks to appeal here.  You know, it is moot, so that's also a strong argument for the Court not needing to reach that argument as well as for just denying it.  But, you know, if the U.S. Attorney in Florida wants to go to a district court judge and (indiscernible) they can do that while we're getting a $2 million bond signed, I don't see any reason for the Court to grant a stay here though.  And I don't believe there's any authority for the Court to do that.

MS. KOSTOPOULOS:  I think, Your Honor, first, obviously there are sort of a number of examples in this district where stays are authorized precisely to permit the Government time to consider whether or not an appeal is warranted for conditions that are being set by the Court.  But I think, more to the point, as I acknowledged

when I made the application, it really is just belt and

suspenders in order to give, given that this prosecution

is happening outside of our district, that district time

in order to bring an application to the district court in

the Middle District of Florida in the event that the

defendant were somehow to satisfy the conditions of his

release within 24 hours.  And, again, we would, you know,

we'll take the steps that we're directed to do in terms

of making it possible for him to begin meeting those

conditions, but the stay is really designed as belt and

suspenders to give the Middle District of Florida time in

the event those conditions were met.

THE COURT:  All right, I'll grant a stay to the

close of business tomorrow.

MS. KOSTOPOULOS:  Thank you, Your Honor.

THE COURT:  Which arguably is less than 24

hours.  All right, now, Mr. Goudreau, I need to warn you

that if and when you are released and you fail to appear

in court, whether it's here or more likely in the Middle

District of Florida, as required or if you violate any of

the conditions that I just set forth, a warrant will be

issued for your arrest.  You and anyone who signed this

bond will be responsible for the full amount of the bond,

that is, $2 million.  And on top of that you could be

charged with a crime of bail-jumping.  And there's

another consequence as well.  If you were to commit a new

offense, a new crime while you were on release in this

case, in addition to whatever punishment you might

receive for that hypothetical new crime, you would be

subject to enhanced punishment in this case of an

additional term of imprisonment of not more than ten

years if that new offense was a felony and not more than

one year if it was a misdemeanor, and that term of

imprisonment would run consecutively, in other words, on

top of any sentence of imprisonment you get in the case

in which you have been charged in the Middle District of

Florida.

Is there a date we should set for Mr. Goudreau's

appearance in the Middle District of Florida?

MS. KOSTOPOULOS:  I don't believe that a date

has been set yet in the District, Your Honor, so we could

set 30 days as the control date or whatever the Court

prefers.

THE COURT:  Okay.  I'll set 30 days as a control

date.  Well, you want 30 days or you want more like 14

days?

MS. KOSTOPOULOS:  I think it really depends,

Your Honor, on whether or not the defendant is released

or whether or not he continues to be detained.  I think

typically the control date is just the point at which the

parties report to the court if the defendant, assuming

he's detained, has not been transported to the district

that's prosecuting him or if he's been released, then the

District of Florida will set a date at which time they

would want him to be seen.  So from our perspective --

THE COURT:  It's just a control date.

MS. KOSTOPOULOS:  Exactly.

THE COURT:  All right, I'll set a control date

30 days out, which is August 29, 2024.  That's a control

date for you to appear in the Middle District, but,

again, it's a control date meaning it undoubtedly is

going to be superseded by events including whenever the

Middle District of Florida wants you to appear down

there.  Okay?  Is there an application needed or sought

with regard to the Speedy Trial Act?

MS. KOSTOPOULOS:  No, Your Honor, the time is

excluded under the Speedy Trial Act given that the

defendant is currently outside of the district and has

not yet traveled to the district that is prosecuting him.

THE COURT:  Okay, very well.

MS. McCRAE:  Your Honor, may I just make one

brief application?

THE COURT: Yes.

MS. McCRAE: This is not even remotely to cast aspersions on Ms. Kostopoulos. I've had a couple of situations recently where conditions needed to be met in order for a client to get out, and the U.S. Attorney's Office assigned a paralegal to the case who was sort of out of the office for a couple of days. So we weren't able to schedule the interviews. So I'm just going to politely ask if --

THE COURT: I already addressed that with her. I'm not going to address it again.

MS. McCRAE: No, I understand but just so that there's been an administrative delay a couple of times on these cases.

THE COURT: I've already talked to the Assistant U.S. Attorney about my expectation that the Government will cooperate in promptly doing whatever it needs to do to ensure that Mr. Goudreau can satisfy the conditions. There's – you may not have heard that. You might've been talking to your client.

MS. McCRAE: I did (indiscernible), Your Honor.

THE COURT: But I'm not repeating that. Anything further from the Government?

MS. KOSTOPOULOS: No, not from the Government,

Your Honor, thank you.

       THE COURT:  Anything --

       MS. McCRAE:  No, Your Honor, I just to get (inaudible).

       THE COURT:  Okay.

       (Whereupon the matter is adjourned.)

<u>C E R T I F I C A T E</u>

I, Carole Ludwig, certify that the foregoing transcript of proceedings in the case of USA v. GOUDREAU, Docket #24m2753, was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature_____

                    Carole Ludwig

Date:  July 31, 2024