UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO. 8:24-CR-330-VMC/CPT

UNITED STATES OF AMERICA,

v.

JORDAN   GUY   MACDONALD
GOUDREAU,

     Defendant.

_____/

**RESPONSE IN OPPOSITION TO GOVERNMENT'S MOTION
FOR REVOCATION OF THE RELEASE ORDER [D.E. 22]**

ANDREW S. FELDMAN
FELDMAN FIRM PLLC
150 SE 2nd Avenue, Suite 600
Miami, FL 33131

MARISSEL E. DESCALZO
TACHE BRONIS DESCALZO, P.A.
150 SE 2nd Avenue, Suite 600
Miami, FL 33131

*Attorneys for Jordan Guy MacDonald Goudreau*

1

## TABLE OF CONTENTS

I.    INTRODUCTION .........................................................................4

II.   JORDAN GOUDREAU: AN AMERICAN SOLIDER ...................................6

III.  APPLICABLE LEGAL STANDARD ..........................................9

IV.   ARGUMENT ...............................................................12

  A.  The nature and circumstances of the offense charged support pretrial release.
     14

  B.  The government misconstrues the weight of the evidence against Jordan and
  ignores critical background information regarding Operation Gideon .................18

    i.   Events Giving Rise to Operation Gideon and the U.S.-Venezuela
    Relationship ...............................................................18

    ii.  The Weight of the Evidence Supports Pretrial Release .............................21

  C.  The History and Characteristics of Jordan strongly support pretrial release ...24

    i.   Jordan has ties to Florida and New York and the U.S...............................24

    ii.  Jordan's "Past Conduct" is Characterized by His Deep Patriotism as a
    Special Forces veteran who loves America .......................................24

    As described infra, Jordan is a true American hero.  He devoted his life to fight
    on behalf of the United States in the war against global terrorism.  He loves the
    United States.  He fought for the United States without regard to his personal life
    and safety.  This is a man that is loyal, honorable, and has integrity.  This is not
    a man that will disregard a court order.  These are all factors that strongly weigh
    in favor of his pretrial release...........................................................25

    iii..   No history relating to drug or alcohol abuse, criminal history, and record
    concerning appearance at court proceedings ...................................25

    iv.  Jordan was Living in Plain Sight .............................................26

    v.   For the past five years, Jordan has been in regular contact with government
    agencies .....................................................................28

    vi.  Jordan is permitted to stay at the MacDill Airforce Base and is required to
    check in and out of the Base ...............................................31

    vii. Jordan's Google searches, Mexican travel, and alleged failure to keep a
    "known" address are "fake news" ...........................................32

viii.    Jordan's Financial Resources Would not Provide Him with the Financial Means to Live or Flee to Another Country ....................................................... 36

ix.    Jordan's Diet -Brain Health and Not Available in Prison ...................... 37

D.   Jordan poses no danger to any person or the community if released pretrial . 38

E.   Mrs. Gatien is still ready and willing to pledge her real property which supports Jordan's immediate release from detention. .......................................... 39

V.   RECOMMENDED CONDITIONS OF PRETRIAL RELEASE ................... 40

# I.     INTRODUCTION

This court should affirm Magistrate Stein's Order of Release and release Jordan pretrial on the same conditions that were ordered by Magistrate Judge Gary Stein.

First, the government has ***not proffered any new information*** about Mr. Goudreau that is sufficient to warrant upending the Magistrate's careful review of the record and a revocation of the Order of Release. The supposedly new information consists of a Mexican driver's license and information about Jordan's partner which, standing alone, or collectively, cannot satisfy the government's burden to prove that pretrial detention is now warranted.

Second, this is *not* a rebuttable presumption case or a case where Mr. Goudreau faces any mandatory minimum penalty. Jordan is entitled to release unless the government demonstrates that a detention hearing is warranted under 18 U.S.C. Section 3142(f)(2)(A) or (B) because the "case involves" a serious risk of flight *or* a serious risk that Jordan will obstruct justice or tamper or intimidate or injure witnesses. Even then, the serious risk posed by Jordan must be sufficient for this court to find that a combination of the least restrictive conditions will not assure that Jordan appears at future proceedings and/or the safety of any other person and the community. The government has failed to satisfy any of these burdens. 18 U.S.C. Section 3142(c) and (f).

Third, each of the Section 3142(g) factors support Jordan's immediate release from detention and the denial of the government's motion.

4

The nature and circumstances of the offense and the weight of the evidence support Jordan's release. The offense conduct involves the exportation of firearms and other banned items in violation of the Armed Exports Control Act (AECA) and the Export Control Reform Act (ECRA) but Counts 1-12 contemplate regulatory offenses which do not involve the use of firearms to engage in violence and, if convicted, do not subject Jordan to 10-20 years of imprisonment. Likewise, Counts 13-14 are not violent crimes and are more appropriately characterized as failure to register offenses. The weight of the evidence also supports pretrial release. The government omitted critical background information about Jordan, about the United States' prickly relationship with Venezuela and our open condemnation of the Maduro regime, which are each necessary to contextualize the alleged export violations. Further, the alleged AECA violations, ECRA violations, smuggling violations, and the conspiracy are each *specific intent offenses* requiring the government to prove the highest level of *mens rea* in any criminal case – a knowing violation of specific law – which is akin to the level of proof required in a criminal tax case.  Complicating the government's case further, Jordan may raise a public authority and/or an innocent intent defense each of which are specifically recognized by this Circuit.  *United States v. Alvarado*, 808 F.3d 474, 489 (11th Cir. 2015); *United States v. Grajales,* 450 Fed. Appx. 893, 900–01 (11th Cir. 2012).

Jordan's history and characteristics support pretrial release. Jordan is a Special Forces combat veteran who was deployed overseas for combat and special missions for approximately 15 years. Jordan has significant ties to the United States including

in Florida and New York. Jordan has been living in plain sight for years. Jordan, through his prior counsel, has been in constant communication with the government for more than 4 years since no later than May of 2020. Jordan has never departed the country *illegally*. Jordan has never used any aliases. Nor does Jordan have the financial means to live in another country. To the contrary, Jordan has renewed passports, Department of Defense identification credentials, and TSA precheck. Jordan has attended sentencing hearings in U.S. district courts openly and obviously as recently as January of this year. Jordan is not hard to find and poses no risk of flight.

Lastly, Jordan poses no danger to the community, or the safety of any other person and the government does not present this court with any information to credibly suggest otherwise.

## II.   JORDAN GOUDREAU: AN AMERICAN SOLDIER

Jordan served this country honorably, dutifully, and loyally from February 2001 until February 2016 when he was honorably discharged due to severe combat-related injuries.  Jordan was highly decorated and received many honors, medals, and badges, including but not limited to, three bronze star medals, four Army good conduct awards, Global War on Terrorism Expeditionary Medal, Global War on Terrorism Service Medal, Iraq Campaign Medal with Campaign Star, and National Defense Service Medal.  A complete listing of Jordan's badges, medals, decorations can be found in his Certificate of Release or Discharge from Active Duty.[1] In addition to

---

[1] **Exhibit 1**, Certificate of Release or Discharge from Active Duty

medals and decorations, Jordan regularly participated in schooling to improve his skills as a soldier and always graduated at the top of his class and on the Commandant's List.

Jordan was not only a soldier, but he was also a Special Forces Green Beret and selected to be a member of the elite branch of the Special Forces known as Delta Force. While much of Jordan's work on the Delta Force is classified, his NCO Evaluation Reports provide a glimpse of his job duties. Specifically, Jordan is described as an assault force cell leader deployed with the capability to solve sensitive crisis situations, member of a 5-man close quarters assault cell and helps to coordinate and train his team on live fire close quarters battle.[2]

Jordan's work for the Special Forces resulted in multiple deployments to Iraq and Afghanistan that placed him at the center on the war on global terrorism fighting on behalf of the United States. Jordan jumped out of planes, engaged in close quarters combat, and was exposed to a great deal of grenade and IED blasts. Jordan was knocked unconscious by an enemy wielding a lead pipe. He was on night patrol when enemy combatants dropped grenades from rooftops. He was riding a military vehicle that was hit with an IED. To escape enemy combatants, Jordan rammed a military vehicle into an enemy bus loaded with shooters. These are just a few examples of the sacrifices that Jordan has made for the United States.

---

[2] **Exhibit 2**, NCO Evaluation Report.

Despite the government's claims to the contrary, Jordan has been nothing but law abiding and loyal to the United States. This is well documented in Jordan's army records. Because of nature of Jordan's work for the military, his loyalty, integrity and honor were constantly assessed by his leaders. As described by his leaders, Jordan's "personal integrity and moral values are beyond reproach" and "loyalty and duty to the United States are unquestionable." *See id.*



*See id.*

Jordan suffered countless concussions due to his position on the special forces and his involvement in close quarter combat. The constant combat took an incredible toll on Jordan's body. During his 2014 deployment, his body started to break down on him. As a result, he was honorably discharged due to his health conditions in 2015.

Following his time in the military, Jordan has worked on putting his mind and body back together with the help of the doctors at the Veteran's Administration, the Cleveland Clinic, and other health professionals that specialize in soldiers that have faced combat in the most dangerous conditions like Jordan. And Jordan's recovery

continues today.  He still suffers from tinnitus, which is constant ringing in his ears, caused by the concussions from the blasts.  He also suffers from headaches. dizziness, and balance disturbance.

### III.    APPLICABLE LEGAL STANDARD

After the Government files a motion, the district court may review a magistrate judge's release order. 18 U.S.C. § 3145(a)(1). In doing so, the district court should conduct an independent review of the evidence put forth at the hearing before the magistrate judge and consider the § 3142(g) factors to determine whether detention is appropriate. *United States v. King*, 849 F.2d 485, 490 (11th Cir. 1988). The review is conducted *de novo. United States v. Hurtado,* 779 F.2d 1467, 1472 (11th Cir. 1985). After conducting that review, if the district court concludes that the magistrate judge correctly applied the law, "[t]he court may then explicitly adopt the magistrate's pre-trial [release] order." *United States v. Alverez-Lopez*, Case No: 2:14-cr-45-FtM-38CM, at \*4 (M.D. Fla. June 6, 2014) However, if necessary to the resolution of an essential issue of fact, the district court may marshal further evidence by convening a hearing. *United States v. Megahed,* 519 F.Supp.2d 1236, 1241 -1242 (M.D. Fla. 2007).

Those 3142(g) factors include: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings," and

9

"whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law;" and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. *See* 18 U.S.C. § 3142(g).

More specifically, when reviewing the magistrate's findings regarding the § 3142(g) factors, factors (1) and (2) require the trial court "to exercise judgment and discretion in applying legal standards to certain facts, rendering such determinations mixed questions subject to de novo review," whereas factors (3) and (4) "pose factual questions pertaining to individual characteristics of the defendant and the threat posed by his release" and are, therefore, subject to the clearly erroneous standard of review. *United States v. Alberts,* No. 6:15-mj-1435-Orl-37TBS, at *3 n.2 (M.D. Fla. Aug. 26, 2015), *quoting Hurtado,* 779 F.2d at 1472.

Against this backdrop, the government must still demonstrate that by a preponderance of the evidence there is no combination of conditions that will reasonably assure Jordan's appearance at future proceedings *or* by clear and convincing evidence that there is no combination of conditions that will reasonably assure the safety of any other person and the community. *See also* 18 U.S.C. § 3142(e) ("If, after a hearing pursuant to the provisions of subsection (f) of this section, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person

before trial."); *see also* Docket Entry ("D.E.") 22 at 8 (Govt Revocation Motion) ("it is the government's burden to show by clear and convincing evidence that no condition or combination of conditions will reasonably assure the appearance of Goudreau.")

This is because the drafters of the Bail Reform Act recognized that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).

Indeed, in cases not involving a statutory presumption of detention (which this is), a person should be released pretrial on personal recognizance or upon execution of an unsecured appearance bond in an amount specified by the court *unless* the court finds that "release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." *See* 18 U.S.C. §§ 3142(a)(1) and 3142 (b). *United States v. Sambasivam,* 2023 U.S. Dist. LEXIS 146309 * (S.D. W. Va. Aug. 21, 2023) ("[t]he statutory language is clear. Unless the court determines that release on personal recognizance or an unsecured appearance bond will not reasonably assure the appearance of the person … the Court shall order such release. Evaluation of potential conditions under 3142(c) takes place only after the judicial officer determines that the release described in sub-section (b) will not reasonably assure appearance of the person as required.."); *see also United States v. Barker,* 2017 U.S. Dist. LEXIS 9820 *at 43 (N.D. Tex. Jan. 24, 2017) (reinforcing the plain language of Section 3142(b) and terminating certain pretrial conditions requested by the government in multi-defendant health care fraud prosecution).

Even if the court were to make either of those determinations under the appropriate standard, the BRA instructs that the court *shall* order the pretrial release of the person subject to the least restrictive further condition, or combination of conditions that will reasonably assure the appearance of the person as required and the safety of any other person and the community. 18 U.S.C. § 3142(c)(1)(B); *United States v. Price,* 773 F.2d 1526, 1527 (11th Cir.1985) (per curiam).") ("The policy underlying the Bail Reform Act "is to permit release under the least restrictive condition compatible with assuring the future appearance of the defendant."); *United States v. Resendiz-Guevara,* No. 15-CR-66-FtM-29CM (M.D. Fla. 2015) (defendant with an ICE detainer charged with illegal reentry was released on $50k bond with conditions).

## IV.   ARGUMENT

First, this court should affirm Magistrate Stein's Order of Release. The government has already conceded that the Order contemplates an "alternative that would reasonably assure Mr. Goudreau's appearance" at future proceedings. D.E. 22 at 13 (Govt Motion to Revoke). And, contrary to its assertions, the government has **not proffered any new information** about Jordan that is sufficient to warrant upending the Magistrate's careful review of the record and a revocation of the Order of Release. The new information is limited to a Mexican driver's license[3] and an affidavit about whether Ms. Gatien is Jordan's girlfriend.[4]  Jordan did not use aliases. Jordan was not

---

[3] The government emphasized Jordan's internet searches and reinforced that Mr. Goudreau illegally traveled to Mexico which is simply incorrect. D.E. 22-1 at 16-17, 22, and 39.
[4] The photos of the firearms, firearm components, and laser sights were all introduced at the detention hearing in New York. D.E. 22-1 at 12 and 20. Likewise, the government expounded on the internet searches at length during the hearing. *See* D.E. 22-1 at 16, 25, and 35.

on bond or under court supervision and was able to travel freely to Mexico or any other country. Jordan and Ms. Gatien are close friends and have cohabitated. Frankly, the nature of their professional and personal relationship and how Jordan and Ms. Gatien define it should not factor into whether Jordan is released. The bottom line is that Ms. Gatien is willing to pledge her property as part of Jordan's conditions of release.

Second, this is not a rebuttable presumption case. Jordan is entitled to release unless the government makes two separate showings; *first*, that they are entitled to a detention hearing because Jordan poses a serious risk of flight or a serious risk of obstructing justice or intimidating/threatening/injuring witnesses, see 18 U.S.C. Section 3142(f)(2)(A)-(B), and *second*, that no combination of conditions is sufficient to reasonably assure that Jordan appears at future proceedings in this case and/or to reasonably assure the safety of any other person and the community. 18 U.S.C. Section 3142(c) and (f). The government has failed to make such a threshold showing. Theoretical flight is not an argument that this court should accept as a basis for pretrial detention. *United States v. Kaplowitz*, No. 14 20323-CR-ALTONAGA, at *9 (S.D. Fla. May 22, 2014), citing *U.S. v. Giordano,* 370 F. Supp. 2d 1256, 1264 (S.D. Fla. 2005) (other citations omitted) (in multimillion dollar health care fraud case against defendants where defendants faced the possibly of spending the remainder of their lives in prison if convicted at trial the court found that "[a]t best, the facts illustrate "[a] mere theoretical opportunity for flight" by these Defendants, which is an insufficient ground for pretrial detention..")

Third, as set forth below, each of the 3142(g) factors support Mr. Goudreau's immediate release from detention and the denial of the government's motion. *United States v. Francisco*, 2:24-MJ-1015-JES-NPM, at *1 (M.D. Fla. Mar. 1, 2024) (denying government's motion to revoke release order in case involving possession of machine gun and distributing cocaine); *United States v. Saleh*, 8:23-mj-1215-CEH-SPF, at *1 (M.D. Fla. Apr. 24, 2023) (revoking order of detention after motion filed under Section 3145(a)(1) even though defendant allegedly "engaged in a conspiracy to sell unlicensed firearms in furtherance of drug trafficking to undercover agents with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF")."); *United States v. Maxie*, Crim. Act. 1:24-cr-112-TFM, at *1 (S.D. Ala. Aug. 8, 2024) ("2 in 1:24-cr-113) (denying government's motion to revoke release order in case involving cocaine trafficking and obstruction offenses); *United States v. Garcia*, CRIMINAL ACTION 23-285, at *10 (E.D. La. May 7, 2024) (denying government's motion to revoke defendant's release order in case involving trafficking methamphetamine and where defendant was a U.S. and *Mexican* citizen); *United States v. Sabhnani*, 493 F.3d 63 (2d Cir. 2007) (vacating detention order despite defendant's "ample means to finance flight" and strong foreign business and family ties).

### A. The nature and circumstances of the offense charged support pretrial release.

The offense charged carries no statutory presumption of detention and Mr. Goudreau is not subject to any minimum mandatory penalties.  Instead, the offenses

charged (other than Counts 13-14)[5] each involve a regulatory violation involving the exportation of 26 firearms (2 fully automatic firearms and 24 semi-automatic rifles), red laser sights, night vision goggles, and other items on the Commerce Control List (CCL) established by the Department of Commerce Bureau of Industry and Security (BIS) and/or the Munitions List implemented by AECA without a license or an exemption as required by the Armed Exports Control Act (AECA) and/or the Export Control Reform Act (ECRA).

And, while the offense conduct of exporting rifles to Colombia inherently involves firearms, it does not involve the use of a firearm or other dangerous weapon in connection with a violent offense (*e.g.* possession of a firearm in furtherance of drug trafficking). Moreover, in this district, numerous defendants, ***including the co-defendant***, Yacsy Alexadra Alvarez, have been granted pretrial release for similar, if not identical offenses. *See e.g. United States v. Ayman Nematalla,* 12-cr-00045-TJC (M.D. Fla.) (signature bond in case involving exportation of firearms without a license); *United States v. Yuksel Senbol,* 23-cr-00384-MSS (M.D. Fla) (obtained 25k signature bond in cases involving exportation of firearms to Sweden without a license); *United States v. Pedro Linares Garcia,* 18-cr-94-MRM (M.D. Fla.) (signature bond of 10k in case involving AECA violations for exporting firearms);*United States v. Ihor Radionov,* 20-cr-00308-WFJ (M.D. Fla.) (signature bond in cases involving the exportation of at least 16 firearm components including Glock slides and barrels to Ukraine).

---

[5] Count 13 alleges violation of the National Firearms Act by possessing silencers that were not registered to Mr. Goudreau. Count 14 alleges unlawful possession of a machine gun.

Furthermore, the conduct alleged in the Indictment does not involve exportation of weapons to any organization or group whose mission or objectives are inconsistent with the national security interests of the United States. Nor does it involve exportation to a country (Colombia)[6] that the United States has designated as particularly problematic (*e.g.* Sudan or Yemen).

Beyond this, the government insists that Jordan is a serious risk of flight because Jordan faces the possibility of a 10-to-20-year prison sentence. This is incorrect for several reasons.

First, if convicted, Mr. Goudreau faces a possible sentence for Counts 1-12 (conspiracy, 554 smuggling, AECA violations, and ECRA violations) which likely will not exceed 63 months pursuant to U.S.S.G. Section 2M5.2 of the Guidelines which sets a base offense level of 26 (63-78 months) for AECA violations and similar conduct (*e.g.* Section 554 or Section 371 offense involving AECA violations). *See United States v. Stines*, 34 F. 4th 1315 (11th Cir. 2022) (46 months for defendant convicted of exporting firearm components to Haiti); *United States v. Arispe*, No. 23-13752, at *3 (11th Cir. June 20, 2024) (46 months for exporting firearms and firearms part in

---

[6]  In fact, Colombia is considered an ally in law enforcement and security cooperation according to the State Department. *Available at https://www.state.gov/u-s-relations-with-colombia/* ("the United States closely cooperates with Colombia to investigate, arrest, prosecute, and disrupt transnational criminal organizations and terrorist groups whose activities, especially narcotrafficking, are devastating to the citizens of both countries and regional partners.  Our efforts focus on strengthening rule of law and judicial institutions, including transitional justice; enhancing respect for human rights; boosting economic opportunities; developing and improving rural infrastructure; and confronting criminal activities, including narcotics production, illegal mining, and deforestation.").

violation of AECA to Bolivia); *United States v. Omar Arriojas,* 23-cr-21-TBB (M.D. Fla.) (18 months for exporting firearms to Venezuela in violation of AECA through a freight-forwarder at Miami airport); *But Compare U.S. v. Oldani*, CRIMINAL ACTION No. 3:09-00010, at *9 (S.D.W. Va. June 16, 2009) (*sentence of 5 months* after granting a downward variance and departure for *defendant veteran* who exported night vision rifle scopes he stole from a Marine base in violation of AECA where sentencing guidelines called for a sentence of 46 months).

Second, Count One (Section 371) has a statutory *maximum* of 5 years and, in similar cases, the potential punishment for the offenses in Counts 13-14 --failure to register silencers and/or unlawful possession of a machine gun -- has included pretrial diversion. *See U.S. v Thomas Adams*, 16-cr-00081-BAJ (M.D. La) (pretrial diversion for unregistered firearm); *U.S. v. Nyiesha Ford*, 21-cr-00021 (M.D. Ga.) (pretrial diversion for possession of firearm with obliterated serial number in violation of Sections 922 and 924); *see also U.S. v. Shyterius Elder*, 21-cr-00021 (M.D. Ga. 2023) (pretrial diversion for theft of firearms for licensed firearm dealer).

Third, and importantly, even if convicted, Mr. Goudreau is entitled to a downward departure under Section 2M5.2 (or a variance) because "*[t]he base offense level assumes that the offense conduct was harmful or had the potential to be harmful to a security or foreign policy interest of the United States.  In the unusual case where the offense conduct posed no such risk, a downward departure may be warranted.*" *See* App. N. 1, U.S.S.G. Section 2M5.2. Here, the government asserts that the intended conduct involves exportation of weapons to assist the U.S. government in defeating the corrupt Maduro regime in

17

Venezuela --which has consistently posed a threat to the United States' national security and economic interests for the past decade. And so, this case would present the unusual case meriting a departure. *Id.*

### B. The government misconstrues the weight of the evidence against Jordan and ignores critical background information regarding Operation Gideon

The government misconstrues the weight of the evidence against Jordan and omits critical background information regarding Operation Gideon which is necessary to understand the genesis of the investigation and Indictment.

i.   *Events Giving Rise to Operation Gideon and the U.S.-Venezuela Relationship*

The events giving rise to Operation Gideon began in 2019 when Venezuela's President Nicolas Maduro declared himself the winner of an election against Juan Guaido and held an inauguration.  Guaido's team and other national leaders alleged that Maduro did not legitimately win the election.  Two weeks after the inauguration, United States President Trump publicly announced that he recognized Juan Guaido as the legitimate president of Venezuela.[7]  President Trump further stated that "[i]n its role as the only legitimate branch of government duly elected by the Venezuelan people, the National Assembly invoked the country's constitution to declare Nicolas Maduro illegitimate, and the office of the presidency therefore vacant. The people of Venezuela have courageously spoken out against Maduro and his regime and

---

[7] Diamond, Jeremy and Sanchez, Boris, *"Trump recognizes Venezuela opposition leader as nation's president"*, CNN, https://www.cnn.com/2019/01/23/politics/trump-juan-guaido-venezuela/index.html, (Jan. 24, 2019)

demanded freedom and the rule of law."[8] President Trump also stated that he "will continue to use the full weight of United States economic and diplomatic power to press for the restoration of Venezuelan democracy."[9]  Following President Trump's statements, Secretary of State, Michael R. Pompeo released a press statement wherein he stated "[t]he Venezuelan people have suffered long enough under Nicolas Maduro's disastrous dictatorship. We call on Maduro to step aside in favor of a legitimate leader reflecting the will of the Venezuelan people. The United States supports President Guaido as he establishes a transitional government, and leads Venezuela, as the country prepares for free and fair elections."[10]  The United States also took the unusual step of giving Guaido access to assets belonging to Venezuela held in the United States which are worth hundreds of millions of dollars.[11]

The United States always maintained that all options were on the table to assist in the effort to oust President Maduro and install Guaido as the President of Venezuela.  For instance, in a speech in May 2019, Vice President Mike Pence vowed that the United States would stand with the people of Venezuela until "libertad" [liberty] is restored.[12] Secretary of State Pompeo publicly stated "If the question is, is the United States

---

[8] *Id.*

[9] *Id.*

[10] Pompeo, Michael R., Sectary of State, *"Recognition of Juan Guaido as Venezuela's Interim President"*, United States Department of State,  https://2017-2021.state.gov/recognition-of-juan-guaido-as-venezuelas-interim-president/ (Jan. 23, 2019).

[11] Palladino, Robert J., Deputy Spokesperson, *"Protecting Venezuela's Assets for the Benefit of the Venezuelan People"*, United States Department of State, https://2017-2021.state.gov/protecting-venezuelas-assets-for-benefit-of-venezuelan-people/, (Jan. 29, 2019).

[12] Herman, Steve "*VP Pence Signals Rewards with a warning in Venezuela Speech*", VOA, https://www.voanews.com/a/pence-venezuela-speech/4908516.html (May 8, 2019).

prepared to consider military action if that's what it takes to restore the democracy there in Venezuela, the president's been consistent and unambiguous about that, that the option to use military force is available if that's what is ultimately called for."[13] This was following questions about whether or not the United States had deployed 3000 soldiers to Colombia.[14]

In February 2020, nothing had changed in Venezuela, but the United States continued to show its support for Guiado.  Guiado was an invited guest at the State of the Union in February 2020 and received praise from President Trump.[15]    And in March 2020, the United States indicted Maduro and 14 other current and former Venezuelan officials charging narco-terrorism, corruption, and drug trafficking in *United States v. Nicolas Maduro Moros*, Case No. 11 Cr. 205, S.D.N.Y. (March 26, 2020).  All these public statements and events provide an alternative theory of Jordan's actions in relation to Operation Gideon and weigh against the government's version of this case.

Moreover, the information publicly available about the statements made by the key players in the battle to oust Maduro and install Guaido following Operation Gideon further call in to question the government's version of events.  Particularly, in a press briefing at the State Department, Secretary of State Michael R. Pompeo states that

---

[13] Gehrke, Joel "*Pompeo: 'Military force is available' to oust Maduro 'if that's what it takes,'*" Washington Examiner, https://www.washingtonexaminer.com/news/1697892/pompeo-military-force-is-available-to-oust-maduro-if-thats-what-it-takes/ (May 1, 2019).

[14] *Id.*

[15] Madhani, Aamer, *"Trump praises Venezuela's Juan Guaido at the State of the Union"*, PBS News, https://www.pbs.org/newshour/politics/venezuela-opposition-leader-juan-guaido-to-attend-state-of-the-union (Feb. 4, 2020).

"There was no US government direct involvement in this operation."[16]   Notably, Pompeo did not say there was **NO U.S. GOVERNMENT INVOLVEMENT**.   Guaido's team concedes that it hired Jordan to capture Maduro, but later backed out.[17]   The two Green Berets that were hired for the mission and captured in Venezuela stated that they believed the mission was backed by President Trump.[18]  And government officials in Venezuela also point the finger at President Trump as the ultimate responsible party.[19]

Cliver Alcala Cordones, Jordan's Venezuelan military counterpart in Operation Gideon, has stated in court filings that the United States government was aware of the operation.  *See United States v. Cliver Alcala Cordones*, Case No. 11 CR 205, (S.D.N.Y. Jan. 8, 2022) at D.E. 71.  He further stated that he was communicating with the highest levels of the United States government, presumably the CIA and Executive Branch regarding Operation Gideon.

ii.   *The Weight of the Evidence Supports Pretrial Release*

The AECA and ECRA violations require the government to prove a willful violation of those laws beyond a reasonable doubt. *U.S. v. Adames*, 878 F.2d 1374, 1377 (11th Cir. 1989) (affirming an acquittal and reinforcing that "[t]he evidence

---

[16] "*Pompeo: No US gov't involvement in Venezuela overthrow plot*", Aljazeera, https://www.aljazeera.com/news/2020/5/6/pompeo-no-us-govt-involvement-in-venezuela-overthrow-plot (May 6, 2020).

[17] Faiola, Anthony "*Venezuelan court sentences two former U.S. Green Berets to 20 years for role in botched raid*" The Washington Post, https://www.washingtonpost.com/world/the_americas/venezuela-court-sentences-former-green-berets-over-failed-anti-maduro-mission/2020/08/08/c49fdf3e-d971-11ea-a788-2ce86ce81129_story.html (Aug. 8, 2020).

[18] *Id.*

[19] *Id.*

21

demonstrates, at most, that Adames was negligent in not investigating the legal prerequisites to the exportation of firearms. It does not prove that she intentionally violated a known legal duty not to export the firearms or purposefully perpetuated her ignorance of the AECA to avoid criminal liability. Though it reasonably could be inferred from Adames' suspicious conduct that she was aware of the generally unlawful nature of her actions, that state of mind is insufficient to sustain a finding of guilt under a statute requiring specific intent."); *United States v. Davis,* 583 F.2d 190 (5th Cir. 1978) (AECA "willfulness connotes a voluntary, intentional violation of a known legal duty"). Likewise, smuggling under Section 554(a) requires the government to prove beyond a reasonable doubt that Jordan *knew that his conduct was unlawful, i.e.* that Jordan knew at the time of the exportation of the prohibited items that he had violated the AECA and/or ECRA. *See* 18 U.S.C. Section 554(a) ("knowing the same to be intended for exportation contrary to any law or regulation of the United States.").

Based on the disjointed presentation by the government in its Motion, the government is far away from meeting their heavy burden of proof. At best, the court might conclude that Jordan conducted internet research on *May 11th and May 14th of 2020.* First, the searches *post-date* the alleged conduct in the Indictment. And so, the internet searches are not relevant to whether Jordan possessed the requisite *specific intent at the time of the offense* to violate any of the specific intent crimes with which Jordan is charged in the Indictment. Second, the searches occurred *after* the investigation became public, *after* Jordan's attorney was engaging in extensive communication with the U.S. Attorney's office about declining prosecution and

closing the investigation, and *after* Jordan was also questioned by law enforcement in *March of 2020* including by the Coast Guard.

Equally as significantly, even if the government were correct – that Jordan agreed to export the prohibited items to Colombia and *knew that* such conduct violated specific U.S. laws, Jordan intends to raise a public authority defense at trial. *United States v. Alvarado*, 808 F.3d 474, 489 (11th Cir. 2015) (public authority requires a showing that "(1) a government official authorized him to take what would otherwise be an illegal action; (2) that this official had the actual authority to permit the action; and (3) that the defendant reasonably relied on the official's authorization"); In the alternative, Jordan intends to raise a good faith defense that he believed, in good faith, that his actions complied with the law. *See e.g. United States v. Grajales,* 450 Fed. Appx. 893, 900–01 (11th Cir.2012) (reversing drug conspiracy and robbery convictions where defendant testified that he genuinely, albeit mistakenly, believed he was working with law enforcement, but district court did not give a proper instruction concerning innocent intent).

The government has known about these potential defenses for almost 5 years since *May of 2020* when Jordan's lawyer advised AUSA SDFL Karen Gilbert that this defense warrants a declination of any prosecution. In an email in February of 2021, this was reiterated to AUSA MDFL Daniel Georges. [20]

---

[20] *See* **Exhibits 5-6,** Email communication between Gustavo Garcia-Montes and AUSA Daniel Georges *and* Email communication between Gustavo Garcia-Montes and AUSA Karen Gilbert.

## C. The History and Characteristics of Jordan strongly support pretrial release

### i.  Jordan has ties to Florida and New York and the U.S.

Jordan has a strong connection to the United States.[21] Jordan also has strong ties to New York and Florida. For almost five years, Jordan has lived between these two states.  In New York, Jordan was enrolled and attended the New York Film Academy on the GI Bill.  Jordan was receiving regular medical treatment at the VA of NYC located at 423 East 23rd Street, New York, NY.  In Florida, Jordan resided at the MacDill Airforce Base.  Originally, Jordan lived in an RV on the base.  When he purchased his sailboat, he sold the RV and lived on the sailboat.[22]  Jordan has strong connections at the MacDill Air Force Base and many veterans that live in the RVs and boats are his friends.

### ii.  Jordan's "Past Conduct" is Characterized by His Deep Patriotism as a Special Forces veteran who loves America

---

[21] *United States v. Mike Juen,* No. 11-MJ-03399-Palermo (S.D. Fla. October 21, 2011)(D.E.- 10) (finding that pretrial detention was not warranted at defendant's bond hearing in the Southern District of Florida pending his removal to the Southern District of Mississippi because defendant had significant ties to the United States and rejected the premise that a defendant must establish substantial ties to the district where the prosecution is commenced because, "it would essentially mean that every defendant who was arrested and charged in a district other than the district where he or she lived (a district where they would not have substantial "community ties") would be a flight risk and subject to pretrial detention."); *United States v. Robinson,* 710 F. Supp. 2d 1065, 1088 (D. Mar. I. 2010) (finding that the "prosecution's argument about ties to this community misapprehends applicable law, which for twenty years has defined 'community ties' under 18 U.S.C. 3142(g), in the context of a defendant's risk of flight, to embrace both the community in which the charges are brought and also a community in the United States to which the defendant has ties."); *United States v. Townsend,* 897 F.2d 989, 995 (9th Cir. 1990) (finding that the community to be considered *must be at least as broad as in the United States."*)(emphasis in original).

[22] Attached at **Exhibit 3** are a handful of receipts for the slip rental

As described *infra,* Jordan is a true American hero.  He devoted his life to fight on behalf of the United States in the war against global terrorism.  He loves the United States.  He fought for the United States without regard to his personal life and safety.  This is a man that is loyal, honorable, and has integrity.  This is not a man that will disregard a court order.  These are all factors that strongly weigh in favor of his pretrial release.

> iii..   *No history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings*

Jordan has an unblemished record.  He has no history of alcohol or drug abuse.  He has no criminal history.  Incredibly, the government claims that Jordan's actions reflect a "flagrant disregard for U.S. laws."  D.E. 22 at 10.  Jordan's patriotism, respect, and loyalty to the United States and its laws is best described below, as attested to by the Executive Branch of the United States.

| | | 20101005 | 20110108 | 20110408 | 20110708 |
|---|---|---|---|---|---|

| PART IV - ARMY VALUES/ATTRIBUTES/SKILLS/ACTIONS  (Rater) | | YES | NO |
|---|---|---|---|
| a.  ARMY VALUES.  Check either "YES" or "NO".  (Bullet Comments are mandatory.  Substantive bullet comments are required for "NO" entries.) | | | |
| | 1.  LOYALTY.  Bears true faith and allegiance to the U.S. Constitution, the Army, the unit, and other Soldiers. | ✓ | |
| Loyalty | 2.  DUTY:  Fulfills their obligations. | ✓ | |
| Duty | 3.  RESPECT/EO/EEO  Treats people as they should be treated. | ✓ | |
| Respect | 4.  SELFLESS-SERVICE.  Puts the welfare of the nation, the Army, and subordinates before their own. | ✓ | |
| Selfless-Service | 5.  HONOR:  Lives up to all the Army values. | ✓ | |
| | 6.  INTEGRITY:  Does what is right - legally and morally. | ✓ | |
| Honor | 7.  PERSONAL COURAGE:  Faces fear, danger, or adversity  (physical and moral). | ✓ | |
| Integrity | Bullet comments | | |
| Personal Courage | o consummate professional; a focused and energetic Noncommissioned Officer | | |
| | o totally dedicated to the unit, mission and Soldiers; a credit to Special Forces | | |
| | o always candid when dealing with teammates and superiors | | |

14. COMMENTS. *(This item is intended to obtain a word picture of each student that will accurately and completely portray academic performance, intellectual qualities, and communication skills and abilities. The narrative should also discuss broader aspects of the student's potential, leadership capabilities, moral and overall professional qualities. In particular, comments should be made if the student failed to respond to recommendations for improving academic or personal affairs.)*

(11a) He exceeded course standards by graduating from the Advanced Noncommissioned Officer Course in the top 20% of his class. His academic average of 98.35% placed him on the Commandant's List. He exemplified the meaning of the "Be, Know, Do" attributes during the course.

| PART IV - ARMY VALUES/ATTRIBUTES/SKILLS/ACTIONS   (Rater) | | |
|---|---|---|

a. ARMY VALUES. Check either "YES" or "NO".  (Bullet Comments are mandatory. Substantive bullet comments are required for "NO" entries.)

| | YES | NO |
|---|---|---|
| 1. LOYALTY:  Bears true faith and allegiance to the U. S. Constitution, the Army, the unit, and other soldiers. | X | |
| 2. DUTY:  Fulfills their obligations. | X | |
| 3. RESPECT/EO/EEO:  Treats people as they should be treated. | X | |
| 4. SELFLESS-SERVICE:  Puts the welfare of the nation, the Army, and subordinates before their own. | X | |
| 5. HONOR:  Lives up to all the Army values. | X | |
| 6. INTEGRITY:  Does what is right - legally and morally. | X | |
| 7. PERSONAL COURAGE:  Faces fear, danger, or adversity  (physical and moral). | X | |

V A L U E S

Loyalty
Duty
Respect
Selfless-Service
Honor
Integrity
Personal Courage

Bullet comments

o loyalty and duty to the United States are unquestionable

o demonstrated bravery and valor during combat operations on numerous occasions

o personal integrity and moral values are beyond reproach

PART V - OVERALL PERFORMANCE AND POTENTIAL

a. RATER. Overall potential for promotion and/or service in positions of greater responsibility.

| AMONG THE BEST | FULLY CAPABLE | MARGINAL |
|---|---|---|
| X | | |

b. RATER. List 3 positions in which the rated NCO could best serve the Army at his/her current or next higher grade.

■■ODA Intelligence Sergeant

e. SENIOR RATER BULLET COMMENTS

o promote to Sergeant First Class now

o send to ANCOC immediately

o very astute NCO, will make an outstanding SFODA Intelligence Sergeant

o very competent, dedicated to the Army and Special Forces Mission, place in positions of increased responsibility

>        iv.    *Jordan was Living in Plain Sight*
> **Since early May 2020, Jordan has interacted through counsel with the government.**

Following the failed operation, on **May 4, 2020**, Jordan publicly took responsibility for the attack.[23]  The United States government through AUSAs Karen Gilbert and Daniel Georges contacted Jordan through his lawyer in mid-May 2020.   Jordan

---

[23] Binding, Lucia *"Venezuela attack: Former US Special Forces solider says he led botched plot to overthrow President Maduro"*, Sky News (May 4, 2020).

cooperated.  On **May 11, 2020,** Jordan's attorney sent an attorney proffer to the government and an interview of Jordan was scheduled for **May 19, 2020**.  On or about **May 15, 2020**, heavily armed government agents showed up at Jordan's residence under the guise of executing a search warrant, entering Jordan's residence, and pointing guns.[24]  This was an extremely traumatic experience for Jordan given his combat history.  Jordan immediately lost trust in these prosecutors and refused to sit for a meeting with them.  Even though he refused to sit for an interview, Jordan continued to cooperate with the government through his attorney.  On **May 27, 2020,** the lawyer turned over Jordan's phone and other files to the government.[25]  Jordan's lawyer continued to communicate with prosecutors and exchange information through **March 2021**.[26]

Gustavo Garcia-Montes continues to represent Jordan today.  A simple search of court records reveals that on **October 30, 2020,** Gustavo Garcia-Montes on behalf of Jordan filed a lawsuit against Juan Jose Rendon in Miami Dade Circuit Court.  *See Jordan Guy Macdonald Goudreau v. Juan Jose Rendon*, Case No. 2020-023458-CA-01. The last action on the docket was a Notice of Taking Deposition on December 11, 2023.  It is unclear why the government did not reach out to Mr. Garcia-Montes to permit Jordan to self-surrender like his co-defendant was permitted to do.

---

[24] A picture of one of the armed agents is attached hereto as **Exhibit 4**
[25] *See* Email communication between Gustavo Garcia-Montes and AUSA Karen Gilbert attached hereto as **Exhibit 5**
[26] *See* Email communication between Gustavo Garcia-Montes and AUSA Daniel Georges attached hereto as **Exhibit 6**

Moreover, Jordan has known for the past four years that the government continues to investigate him because he has regularly received notices from service providers such as Google, Adobe, and others that United States search warrants and Grand Jury Subpoenas have been received regarding Jordan's accounts.[27] Despite receiving these notices, and despite his knowledge of the government's continued investigation, Jordan remained in the United States.

     v.     *For the past five years, Jordan has been in regular contact with government agencies*

On **November 8, 2022,** Jordan obtained a new Department of Defense identification card.





In or around **January 2023,** Jordan lost his passport and contacts the United States Department of State to obtain a replacement.

---

[27] *See* Sample Notices attached hereto as **Exhibits 7A-7B**



On **April 2023,** Jordan is issued a new United States passport.



On **October 19, 2023,** Jordan is scheduled for and attends an interview in order to obtain TSA PreCheck.



On **January 8, 2024**, Jordan submitted a sentencing letter to the United States District Court for the Southern District of New York, in support of Cliver Alcala Cordones.  *See United States Alcala Cordones*, Case No. 11 CR 205, (S.D.N.Y. Jan. 8, 2024) D.E. 144-1 at 10.  The letter was filed on Pacer and is available to the public.

On **January 18, 2024**, Jordan went to the United States District Court for the Southern District of New York and attended a hearing in Cliver Alcala's case. Jordan's presence at the hearing was reported by the Associated Press.  Presumably, Jordan checked in with court security before entering the courthouse.



**Joshua Goodman**
@APjoshgoodman

Fist pumps of support in Manhattan courtroom for ex Venezuela Gen. Alcala from his fellow warrior Jordan Goudreau (far right in U.S. army uniform 👇).

Alcala's sentencing on terror charges was postponed as judge considers prosecutors' claims he was involved in drug trafficking.



3:37 PM · 1/18/24 From Earth · **14K** Views

On **April 11, 2024**, Jordan returned to the United States District Court for the Southern District of New York and attended Cliver Alcala's sentencing hearing.

Finally, for a large part of the past five years, Jordan has been living at the MacDill Airforce Base where he must check in and out.

      *vi.*    *Jordan is permitted to stay at the MacDill Airforce Base and is required to check in and out of the Base*

While the government argues that MacDill officials report that Jordan was not permitted to sleep in his boat at the base, the fact remains that Jordan and other veterans frequently dock their boats at the base and live there. The base has a beach,

gas station, golf course, and large grocery store for veterans.  The climate is pleasant, and it is a nice place for veterans to be around like-minded people.

MacDill[28] requires all those entering to provide credentials and logs are kept.

**MACDILL AIR FORCE BASE GATE OPERATIONS INFORMATION**

In an effort to expedite processing at all gates, drivers are requested to lower their front and rear windows, and collect IDs/credentials from ALL passengers BEFORE approaching the gate.

NOTE: Due to security operations and gate maintenance, gate operating times and closures can occur at any time

A review of gate operations for MacDill will easily confirm Jordan's residence on the base.

> vii.    *Jordan's Google searches, Mexican travel, and alleged failure to keep a "known" address are "fake news"*

The government's Motion points to Jordan's post-offense conduct as a basis to revoke the magistrate's release order.  Importantly, all of this conduct was presented to Magistrate Stein, who rejected these allegations as a basis to detain Jordan.  The government has not presented anything new.  Regardless, we address them here for the benefit of this Court.

The government points to Google searches Jordan immediately performed following the failed operation, Jordan's travel to Mexico, and Jordan's lack of "stable" and "known" residence.  *See* D.E. 22 at 6 (Govt. Motion to Revoke).

---

[28] *See* www.macdill.af.mil.

> *a. Jordan's Internet Searches each date back almost 5 years to May of 2020*

The Google searches were performed over the course of two days in May 2020. Many things have happened since then, including Jordan's contacts and cooperation with federal authorities.  It has been nearly five years since those searches were performed.  It is further clear that those searches were a non-event because Jordan was arrested by the FBI at his known address.  Magistrate Stein seemingly agreed with this analysis based on the questions he posed to the prosecutor during Jordan's first appearance: (1) "repeat the timing of what you said"; (2) "in addition to googling about things he could do, did he do any of those things"; (3) "But of course he is here"; (4) "Where was he arrested?".  D.E. 22-1 at 14-18.

> *b. Jordan's Travel to Mexico and Mexican License is not Indicia of Flight Sufficient to Revoke Order of Release.*

Jordan's travel to Mexico is a non-issue and belied by the government's own Motion.  Jordan traveled to Mexico on May 25, 2020.  Jordan was not under indictment, not subject to bond, and not required to stay in the United States by any Court order.  Jordan was free to travel anywhere, and he went to Mexico where the United States government could easily find him.  The government's insinuation that the travel to Mexico is indicia that Jordan will not appear for his Court appearances in this case is contradicted by the record.  Jordan's attorney continued to be in regular contact with United States authorities on this case during the entire period that Jordan was in Mexico.  And Jordan returned to the United States and has been living here since the summer of 2021.  It has been over three years since his time in Mexico.

The government also claims that U.S. Customs and Border Protection "have no record of Goudreau legally crossing into Mexico."  D.E. 22 at 6.   The government goes on to say that "law enforcement obtained evidence that Goudreau entered Mexico by land and presented Mexican officials with his U.S. passport."  Notably, Jordan used his U.S passport to cross the border and law enforcement has a record of it.  As do the Mexican authorities [*next page*]^29



Further, it is not unusual for U.S. Customs and Border Protection to not have records of land crossings on its borders. It is also not unusual for Americans to cross over to Mexico by land.  Nothing is nefarious about this because Jordan was always out in the open using his United States credentials.

---

[29] D.E. 22 at Exhibit C.

Additionally, the government highlights that Jordan obtained a Mexican driver's license and vehicle registration with dates in June 2021 and May 2021. Again, there is nothing nefarious about this. Jordan used his name, not an alias. *See* D.E. 22 at D. And Jordan has been in the United States since the summer of 2021.

### c.   *Jordan has maintained a residence in the United States*

The government also claims that because Jordan failed to maintain a "stable" and "known" address and failed to update his DMV records, detention is warranted. Yet, this is also a red herring. The government has not provided any case to support lack of "stable" or "known" address as a factor, which standing alone, that supports detention. Moreover, the government could have very easily confirmed that: Jordan has been living in New York since January 2024 and attending school on a GI Bill, Jordan has been receiving services from the VA, and Jordan has been in contact with federal agencies. Before that Jordan was living on the MacDill Air Force Base in Florida, where Jordan had to check in each time he entered and exited the base. Jordan's whereabouts were very much known.

Turning to the claim that Jordan failed to update his DMV records, Jordan was scheduled for an appointment to obtain a new driver's license on August 8, 2024 (below) but that never happened because he was arrested on his birthday on July 30, 2024.



**Reservation Reminder**

This is a follow-up reminder that you have a reservation scheduled with our agency **TOMORROW, 08/08/2024**. If you previously canceled or changed this reservation, please disregard this email.

Client Name:   Jordan Goudreau
Client Email:   lionneck007@gmail.com

Date:            08/08/2024
Time:            1:35 PM

Office:          Belle Glade
Address:         2976 State Road 15 Belle Glade, FL 33430 (directions)
Service:         Driver License/Learners License/ID Card

Reservation ID: **4080411**

> viii.    *Jordan's Financial Resources Would not Provide Him with the Financial Means to Live or Flee to Another Country*

The government claims that Jordan has financial means to flee because he receives a $10,000 a month pension from the military.  Courts routinely grant pre-trial release to defendants that have engaged in financial crimes that have resulted in large profits and have no ties to the United States.  *See United States v. Horst Jicha*, 23-MJ-04496 (S.D. Fla. Jan. 9, 2024) (granting bond to German citizen charged with a $150 million securities fraud in the Eastern District of New York.  Mr. Jicha had no ties to the United States.  All of Mr. Jicha's sureties were German citizens); *See also United States v. Heatherington*, 2:13-cr-00183, (C.D. Cal. Apr. 22, 2019) (granting bond to a Canadian citizen with no ties to the United States charge with a $215 million fraud); *United States v. Ogiermann*, 10-CR-80157 (S.D. Fla. Jan. 26, 2011) (granting bond to two wealthy citizens of Luxembourg with no ties to the United States charged with anti-trust violations.).[30]

---

[30] In fact, even in *extradition cases,* where pretrial release may only be granted based on special circumstances district courts in Florida have granted pretrial release when the offense conduct alleged

The government also claims that Jordan "keeps significant amounts in cryptocurrency" and that cryptocurrency is used to "facilitate criminal activity while evading detection". *See* D.E. 22 at 12. It is widely known that cryptocurrency is no longer undetectable and private and that cryptocurrency is now easily traceable on the blockchain. [31] It is also traceable using the subpoena power of the United States government. Indeed, here, the government determined that Jordan has $44,000 available to him in cryptocurrency. D.E. 22 at 12.

### ix.   *Jordan's Diet -Brain Health and Not Available in Prison*

Because of Jordan's combat history, the Veteran's Administration (VA) sent Jordan to the Cleveland Clinic for a battery test. Following lengthy medical examinations, the Cleveland Clinic recommended a specialized diet that would reduce Jordan's overall swelling. Jordan has been following this diet for over five years. Any variation from the diet is devasting to Jordan's health. Jordan is not getting the diet he requires at the Citrus Detention Center. The failure to receive the proper diet is

---

was drug trafficking, violent crimes, or economic crimes. *In Re Extradition of Matjaz Ruzic,* 09-mc-23380-JOO (S.D. Fla.) (D.E.- 26) (personal surety bond of 200k set after Slovenia request for extradition for ***ecstasy trafficking and money laundering***); *In Re Extradition of Rodney Nichols,* 23-mc-61413 (S.D. Fla) (personal surety bond of 250k set after ***extradition request from Canada for murder*** that occurred in 1975); *In re Extradition of Leiva*, No. 16-23468-CV-O'SULLIVAN, at *3 (S.D. Fla. Sep. 29, 2017)( DE- 49 and DE-50)(10% 100k bond and 1M personal surety bond for Colombian public official who fled to the U.S. after his trial in Colombia for economic crimes); *In Re Extradition of Julio E. Villatoro Monteagudo,* 06-mc-20469-DUBE (DE- 22 and DE-24) (personal surety bond set for 200k and home confinement after El Salvador request for extradition for fraud and money laundering).

[31] Chow, Andrew "Crypto is anything but private", Time Magazine, https://time.com/6239364/crypto-criminals-andy-greenberg/ (Dec. 8, 2022).

causing swelling, which results in dizziness, imbalance, and a host of other issues.
This is another factor in favor of Jordan's pre-trial release.

### D. Jordan poses no danger to any person or the community if released pretrial

The government does not seriously contend that Jordan is dangerous or that
Jordan poses a danger to the community or safety of another person. *See* 18 U.S.C.
Section 3142(g)(4).[32] Instead, the government speculates that Jordan "coached" a
witness on how to answer questions from law enforcement. Who that witness was and
when this occurred is entirely unclear. What is clear though is that coaching a witness
on how to respond to law enforcement is precisely what criminal lawyers do every day
when they advise clients that they possess certain unassailable constitutional rights.

More critically, without the benefit of additional details the government fails to
provide, it is unimaginable (without inference piling) that Jordan's supposed coaching
of a witness *4 years ago* could ever graduate into a showing that Jordan poses a serious
risk of obstructing, tampering, or intimidating a witness, or telling a witness to make
up a story which is a baseline requirement for any detention hearing under 18 U.S.C.
Section 3142(f)(2)(B). In fact, absent such a showing, the government is not even
entitled to a detention hearing. *United States v. Riley*, 21-cr-69 (D.D.C. Feb. 24, 2021)

---

[32] Even if the government had, First, Second, Third, and Fifth, Circuit Courts of Appeals have held
that, in cases such as this where there is no showing under Section (f)(2)(B) that the case involved a
serious risk that defendant would obstruct or intimidate a witness, general dangerousness to the
community is insufficient to authorize detention. *United States v. Himler*, 797 F.2d 156, 160 (3d Cir.
1986); *U.S. v. Ploof*, 851 F.2d 7, 11-12 (1st Cir. 1988); *United States v. Byrd*, 969 F.2d 106, 109-110 (5th
Cir. 1992); *see also United States v. Giordano*, 370 F. Supp. 2d 1256, 1261-63 (S.D. Fla. 2005) (noting
that this Circuit had not addressed this issue but reinforcing that "there is no indication, however,
that our Circuit would interpret section 3142(f) any differently.")

("[W]hat (f)(2)(B) is really getting at is not just obstructive intent generally, but, rather, the risk that somebody's going to . . . obstruct or attempt to obstruct a judicial proceeding.""); *U.S. v. Vendetti*, 10-CR-00360(A)-JJM, at *3 (W.D.N.Y. Feb. 22, 2011) (" to warrant detention, the government must prove that going forward there is not just a risk, but "a serious risk", of obstruction of justice or witness tampering by threats or intimidation. 18 U.S.C. § 3142(f)(2)(B)."); *see also United States v. Zaccaria*, 347 F. App'x 984, 986 (5th Cir. 2009) (reversing a district court order denying a motion for revocation of a detention order because the case did not involve any of the circumstances listed in § 3142(f)); *see also United States v. Randolph*, 536 F. Supp. 3d 128, 131-32 (E.D. Ky. 2021) (granting pretrial release finding that government failed to show a serious risk of obstruction as required by Section 3142(f)(2)(B) even when defendant was charged with obstruction offenses related to January 6th).

### E. Mrs. Gatien is still ready and willing to pledge her real property which supports Jordan's immediate release from detention.

As a threshold matter, the government admits that "[i]t is clear from Judge Stein's ruling that Jordan's ties to Gatien, including that he could be on home detention at her apartment and continue to attend film school, *presented the court with one alternative to detention that would reasonably assure Goudreau's appearance*." **D.E.-22 at 13.**

The government attempts to minimize the very close relationship between Jordan and Ms. Gatien. DE-22 at 14. The fact remains – regardless of any statements Ms. Gatien made to the government about her unwillingness to remain on the bond

after the detention hearing-- Ms. Gatien stands ready and willing to pledge her real property in support of Jordan's pretrial release.[33] *United States v. Delong*, 1:21-cr-009, at *1 (D.N.D. Aug. 11, 2021) (granting motion to revoke bond finding that there has been change in her circumstances "defendant's sister, who had previously indicated that she would not house defendant, has had a change of heart and is now willing to house defendant"); *see also United States v. Grant*, 8:07CR242, at *1 (D. Neb. Oct. 18, 2022) ("defendant to be released after processing to her sister, Malicia Lynn, who shall transport her directly to the Stephen Center, HERO Program").

## V.   RECOMMENDED CONDITIONS OF PRETRIAL RELEASE

Jordan requests that this Court affirm the Magistrate's Order, and the conditions previously imposed by Magistrate Stein and that Jordan be permitted to attend medical appointments and legal visits while on pre-trial release. Alternatively, Jordan's close friend, Ryan Reeves,[34] a Florida resident, is willing to be Jordan's custodian. Mr. Reeves and Jordan met in Afghanistan. Mr. Reeves considers Jordan a brother. Mr. Reeves lives in Florida with his wife and daughter. Mr. Reeves is also willing to co-sign any bond.

---

[33] Declaration of Ms. Gatien at **Exhibit 8**
[34] Declaration of Mr. Reeves at **Exhibit 9**

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that the foregoing was served via CM/ECF on all counsel of record.

*/s/ Marissel Descalzo*