UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO. 8:24-CR-330-VHC/CPT

UNITED STATES OF AMERICA,

v.

JORDAN        GUY        MACDONALD
GOUDREAU,

      Defendant.

_____/

**JORDAN GUY MACDONALD GOUDREAU'S**
**MEMORANDUM IN SUPPORT OF HIS**
**MOTION TO MODIFY BOND CONDITIONS**

Defendant, Jordan Guy MacDonald Goudreau, hereby respectfully files this Memorandum in Support of his Motion to Modify Bond Conditions, and in support thereof states as follows:

**BACKGROUND**

On July 16, 2024, Mr. Goudreau was indicted and arrested in the Southern District of New York, where he was residing at the time.  Mr. Goudreau was removed to the Middle District of Florida.  On September 5, 2024, Mr. Goudreau was granted bond by this Court with conditions that included but were not limited to a personal surety bond secured by Jennifer Gatien.  This motion requests that Mr. Goudreau's bond be modified so that Ms. Gatien can be removed as a personal surety.

When imposing the current conditions of Mr. Goudreau's bond, the Court found they were necessary due to risk of flight.  Given Mr. Goudreau's change in personal circumstances and the additional information that has been learned about the underlying facts of this case, we submit that the modification should be granted.

1

## MEMORANDUM OF LAW

18 U.S.C. 3142(c)(3) provides that the Court may at any time revisit an amend an order of release to impose additional or different conditions.  Here, Mr. Goudreau's changed personal circumstance and the additional information that has been learned about his case, and the viability of his public authority defense warrant the modification requested.

In considering a modification of release conditions, the Court can access 18 U.S.C. 3142(g) factors as they presently exist.  Those 3142(g) factors include: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings," and "whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law;" and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. *See* 18 U.S.C. § 3142(g).

*A.  Mr. Goudreau's History and Personal Circumstances*

Mr. Goudreau has been on pre-trial release for over a year.  Since the date of his pre-trial release, September 4, 2024, his circumstances have changed.  ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



This is a significant change from the manner in which Mr. Goudreau presented on September 4, 2024. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*B.  The nature and circumstances of the offense charged and the weight of the evidence against the person.*

When Mr. Goudreau first presented in this district, counsel did not have much, if any, information regarding Mr. Goudreau's case or his defenses.  In the past year, undersigned counsel, along with the assistance of counsel for Yacsy Alvarez, has been able to piece together the events underlying the charges here.  Mr. Goudreau and Ms. Alvarez have a strong defense of public authority. The defense of public authority, as outlined in *Alvarado*, provides that "know[ing] . . . violation of a federal law, but in . . . reasonable reliance on the authorization of a government official . . . or under color of public authority".  *See United States v. Alvarado*, 808 F.3d at 484 (11th Cir. 2015) (internal citations omitted). The defense of public authority requires a showing that "(1) a government official authorized him to take what would otherwise be an illegal action; (2) that this official had the actual authority to permit the action; and (3) that the defendant reasonably relied on the official's authorization".  Here, Mr. Goudreau and Ms. Alvarez will easily meet the burden.  Specifically, the defense will argue that the president has the authority to give approval for the conduct underlying the Indictment and this authority can be and was transmitted by an intermediary – Keith Schiller and possibly others.  Alternatively, Mr. Goudreau and Ms. Alvarez may advance the closely related defenses of Entrapment-by-Estoppel or Innocent Intent.

The entrapment-by-estoppel defense differs from the public authority defense in that the latter requires the government official who sanctions the illegal activity have actual authority to approve the defendant's criminal activity, whereas the entrapment-by-estoppel only requires that the official have apparent authority.  *Id.* at 484–86.  Lastly, the defense will also have available the innocent intent defense.  While innocent intent is not an affirmative defense, it is an evidentiary negation of the *mens rea* of the alleged crime.  *See id.* at 486-488.  This defense is available if a defendant "genuinely believed that criminal acts he performed were done at the direction, and with the permission, of an appropriate governmental agency"(in the present case, the President of the United States).

Mr. Goudreau's and Ms. Alvarez's defense of public authority is supported by the following undisputed facts and circumstances:

**In 2020, The United States Charged Nicolas Maduro as a Narco-Terrorist, Set a $15 Million[1] Bounty for His Arrest, and Recognized Juan Guaidó as the Legitimate President of Venezuela.**

On March 26, 2020, former Attorney General William Barr and SDNY United States Attorney Geoffrey S. Berman announced the indictment of "former" Venezuelan President Nicolas Maduro and others on Narco-Terrorism charges.[2]  A $15 million reward was offered for Maduro's arrest.  Mr. Barr's and Mr. Berman's lengthy statement included the following:[3]

[NICOLAS MADURO] is the former president of Venezuela.  He previously . . . acted as the vice president of Venezuela in approximately 2013.  [MADURO] succeeded to the Venezuelan presidency after Hugo Chávez died in 2013 and, during his presidency, continued to participate in cocaine trafficking with the *Cártel de Los Soles* and the FARC.  In approximately 2018, [MADURO] declared victory in a presidential election in Venezuela.  In approximately 2019, the

---

[1] $50 Million as of Aug. 7, 2025.

[2] Press Release, United States Attorney, S.D.N.Y., Manhattan U.S. Attorney Announces Narco-Terrorism Charges Against Nicolas Maduro, Current and Former Venezuelan Officials, And Farc Leadership (Mar. 26, 2020), available at https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-announces-narco-terrorism-charges-against-nicolas-maduro-current (last accessed Aug. 25, 2025).

[3] *Id.* at 2–3, *also* DISC-100813–816 (Documents from Mar. 26, 2020, DOJ Press Conference).

National Assembly of Venezuela invoked the Venezuelan constitution and declared that [MADURO] had usurped power and was not the president of Venezuela. Since approximately 2019, more than 50 countries, including the United States, have refused to recognize [MADURO] as Venezuela's head of state and instead recognized Juan Guaidó as the interim president of Venezuela. In approximately January 2020, the U.S. State Department certified the authority of Guaidó, as the interim president of Venezuela, to receive and control property in accounts at the United States Federal Reserve maintained by the Venezuelan government and the Central Bank of Venezuela.

Notably, on August 7, 2025, the United States Department of State and the Department of Justice announced that the reward for Nicolas Maduro had been increased to $50 million, the largest reward ever offered by the United States. Secretary of State Marco Rubio issued the following statement,[4] reading, in part:

> For over a decade, Maduro has been a leader of Cartel de los Soles, which is responsible for trafficking drugs into the United States. On July 25, 2025, the U.S. Department of the Treasury designated Cartel de Los Soles as a Specially Designated Global Terrorist (SDGT).

> Since 2020, Maduro has strangled democracy and grasped at power in Venezuela. Maduro claimed to have won Venezuela's July 28, 2024, presidential election but failed to present any evidence that he had prevailed. The United States has refused to recognize Maduro as the winner of 2024 election and does not recognize him as the President of Venezuela.

### Events Leading to May 2020 Incursion

**In April 2019, "Global Governments," a Private Entity, Offered the U.S.–Backed Juan Guaidó American Assistance in Assuming Control of Venezuela.**

### Global Governments Principals

---

[4] Press Statement, Marco Rubio, Secretary of State, UNITED STATES DEPARTMENT OF STATE, REWARD OFFER INCREASE OF UP TO $50 MILLION FOR INFORMATION LEADING TO ARREST AND/OR CONVICTION OF NICOLÁS MADURO (Aug. 7, 2025), available at https://www.state.gov/reward-offer-increase-of-up-to-50-million-for-information-leading-to-arrest-and-or-conviction-of-nicolas-maduro. (last accessed Aug. 28, 2025).



*Left to right—*▮▮▮▮▮▮▮▮▮▮*, Keith Schiller, Roen Kraft, German Chica, Andrew Davis.*

The Global Governments prospectus identified the "Client" as "The Bolivarian Republic of Venezuela administrated by the Interim President Juan Guaidó and as recognized by United States President Donald Trump."[5]

Characterized as an enterprise for "Venezuela Emergency Assistance," "Global Governments" offered U.S. assistance to President Guaidó.[6] They offered "substantial assistance needed until self-determination has occurred. . . . ..[and] a new government is duly elected, installed and its legitimacy is established across Venezuela." Global Governments was meant to be a "corporate organization [] prepared to mobilize essential assets . . . to transport humanitarian aid and perform tasks in line with the President Guaidó Plan Pais initiative for self-determination."[7] Global Governments was later described to the FBI as a "platform for American companies to get

---

[5] Global Governments Prospectus, at DISC–100938.
[6] Global Governments Prospectus, at DISC–100930—938.
[7] DISC-100931.

work in Venezuela." The Venezuelan side of this was to be represented by P. Betancourt, who would bring "the decision makers in Venezuela to the table."[8]



- **Keith Schiller's** bona fides with President Trump and his administration were emphasized, and he was identified as "Senior Advisor–Security."[12]  Schiller told the FBI that he recruited Jordan Goudreau to work with Global Governments.[13]

- **Roen Kraft**, "the financier of the Venezuela plans,"[14] was pictured as "Senior Advisor for Logistics and Transportation."  Kraft was identified as a Kraft family heir who "established local and regional crude [oil] . . . collection and transport capabilities, . . . [expanding into] maritime transport by ocean going barge and ship, heavy offshore work and transport vessels for the energy industry."[15]

### Roen Kraft Summarized What Was to Follow.

In an April 13, 2019, communication to Schiller, ██████████ and others, Mr. Kraft summarized the state of play then:[16]

Kraft reported that he, Schiller, ████ and several others had just met with a personal representative of President Juan Guaidó, identified as Hector Di Buenaventura, stating, "Since our

---

[8] FBI Interview, Sep. 21, 2020, DISC-103480.
[9] Keith Schiller FBI Interview, DISC-101047–059 (Nov. 17, 2021).
[10] FBI Interview, Sep. 21, 2020, DISC-103483.
[11] Prospectus, DISC–100930–938.
[12] DISC–100936.
[13] Schiller FBI Interview, DISC-101049.
[14] Schiller FBI Interview, DISC-101053 ("He had money to offer and was passionate about the project").
[15] Prospectus, DISC–100930–938.
[16] DISC–100945–46.

last meeting, our general proposal has been given the go ahead by Guaidó, and a method of payment has been developed through the Inter-American Development Bank ["IADB"]."  Kraft noted that:

> Di Buenaventura . . . now realizes our capabilities are far greater than he originally understood, and he [has] updated both Guaidó and Leopoldo on those capabilities. . . [and] our extended group can do everything needed in the private sector, and instructions have been given to close off any conversations with any other private parties. . .. It is important to note there are now **few, if any, that believe VE will have a change of government without military action** of some degree.  Doors are closing around Maduro and actions are underway to assure his fall and removal. . .. **Please note IADB will not pay or approve payment for warfighters or security.  They will need to be booked and invoiced as something such as HSE personnel.**
>
> [T]here is no way to predict the last days of the Maduro regime and if a scorched earth policy is adopted. . .
>
> The ask from Guaidó is for a proposal with time to mobilize, prior work in this regard, followed by draft form of master services. . .. A single point of contact will be established for moment-by-moment response once landings are open.  I believe Curacao is the best location to stage from, as VE now has 17 bases on the frontier border with Columbia (sic).  With Navy disabled, it is a safer approach from Curacao and too, we can divert from Columbia to land with ease was (sic) and option.
>
> For the moment, the issue is to begin to stage, communicate and be ready.
>
> Please communicate any thoughts this may bring forward.
>
> Kraft[17]

So, as of at least April 13, 2019, the Global Government core group including Schiller, ▮▮▮▮

▮▮▮, and Kraft, were discussing "military action" and how to invoice "warfighters."

> **Keith Schiller's Close Relationship With President Trump Played an Important Role in Establishing the President's Backing.**
> Schiller's own published biography for his consulting company, identifies Schiller and

two other partners as "Strategists Who've Operated at the Pinnacle of Power." [18]

---

[17] DISC–100945–46 (emphasis added).

[18] Available at https://www.javelinadvisorsllc.com/?page_id=143 (Mr. Schiller is identified as Managing Director of Javelin Advisors LLC. (accessed Aug. 26, 2025).  Schiller and his partners are identified as George A. Sorial and Robert W. Seiden.  Photograph of Schiller and Sorial (one

In 2004, Mr. Schiller retired from the NYPD as a Detective and was hired to be the personal bodyguard to Donald J. Trump. Mr. Schiller became Director of Security for the Trump Organization, where he served for more than 18 years. After the 2016 election of President Donald J. Trump, Mr. Schiller was appointed as the Deputy Assistant to the President and Director of Oval Office Operations. . .. Upon retiring from public service, Mr. Schiller launched his own company, KS Global Group LLC, which focuses on defense and security consulting. He was hired by the Republican National Committee as Security Consultant advisor and currently works with both private and public entities both domestically and abroad....



Schiller has close ties to President Trump dating back to 2004.[19]

Mr. Schiller's critical role was described ███████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

_____

of his partners) in the Oval Office, accessed from his company website on Mar. 17, 2025, but since deleted. Mr. Schiller was served with a defense trial subpoena through counsel on Mar. 10, 2025.

[19]Schiller soon became a trusted aide to Mr. Trump. *See* https://www.nytimes.com/2024/05/10/nyregion/keith-schiller-trump-trial.html (Stormy Daniels testified in May 2024 that "Mr. Schiller was the person who got her phone number for Mr. Trump after they met at a celebrity golf tournament in 2006 in Lake Tahoe, Nev., Ms. Daniels testified this week. Mr. Schiller also invited Ms. Daniels to meet Mr. Trump for dinner that night, she said, and let her into Mr. Trump's hotel suite when she showed up. . .. The prosecutors appear to have tailored their case to the witnesses who they believe will be more or less forthcoming about what they saw. Mr. Schiller was close to Trump for many years, raising the possibility that prosecutors may have deemed him unlikely to be productive for them on the stand.").



---







---

[23] This contrasts with Schiller's account of this meeting. *See* Schiller FBI Interview, DISC-101049.
[24] FBI Interview, DISC-103490.
[25] FBI Interview, DISC-103491.
[26] FBI Interview at DISC-103469

In a November 17, 2021, interview with the FBI,[27] Mr. SCHILLER claimed there was "no talk of military intervention by anybody in the Global Governments team during any meeting that SCHILLER was aware of."  SCHILLER further discussed the [May 11, 2019] meeting in Miami referred to above by ███, and in direct contrast to ███, SCHILLER claimed he heard "[n]o military talk" at this meeting but allowed that *"[m]ilitary talk could have happened when SCHILLER went out to the rest room or got a coffee . . .."*  This is, of course, contradicted by ███████████ September 2020 statement to the FBI, above.

**President Guaidó's Representatives Signed a Formal Agreement with Jordan Goudreau and Silvercorp for the Venezuelan Incursion in Washington, D.C. (Oct. 16, 2019).**

As the government is aware, on October 16, 2019, both an eight-page "General Services Agreement" and Attachments "A" through "P" ("Guaidó Contract") were signed in Washington, D.C., between Jordan Goudreau and representatives of President Guaidó's government, with Guaidó participating remotely via Zoom.[28]  Guaidó personally signed the General Services Agreement and the Attachments were signed by his representative.  This agreement covered many details of a planned military incursion to remove Nicolas MADURO.  This signing occurred in the Washington office of attorney Manuel Retureta, representing the Guaidó Venezuelan government.  Retureta signed as a witness.

Attachment "O," labeled "Deniability/Credit" may be worth noting.  It reads:

1.  If for any reason the Project Resolution Operation does not succeed, President Guaido will maintain deniability and be absolved from all knowledge and fault by all parties.

---

[27] DISC–101049—50 (italics added).  In his FBI interview, Schiller made other denials of material facts the defendants believe will be shown to be erroneous or intentionally false.

[28] The defense is in possession of a recording of the conversation about the agreement between President Guaidó and Mr. Goudreau.

2.  If the Project Completion Operation (The exit/removal of current Venezuelan Regime and entrance/installation of the recognized Venezuelan Government), All credit will be given to all parties as directed by the Administration.



According to White House visitor logs, on October 16, 2019, at 9:00 A.M, Keith Schiller and three other as-yet-unidentified persons were logged into the White House "WW-OVAL" to meet "POTUS."  Then, at 10:00 A.M., Mr. Schiller and three persons, were logged in to visit "POTUS" in the "RES-YELL."[30]  The government has advised it does know the identities of the three persons who accompanied Schiller.  The defense is still making efforts to identify these persons and considers them material witnesses.

**Schiller and** ███ **Met With Goudreau Approximately Two Hours Later.**

---

[29] FBI Interview, DISC-103492.
[30] DISC–101157–158.



**Conduct of Alexander Horn (Associate Director of Policy, Office of The Vice President) and Jason Beardsley After the Guaidó Contract and Schiller Conveyed Trump's Authority, Supported Goudreau's Belief That He Had Permission to Proceed.**

---

[31] Schiller admits meeting Goudreau in the bar of the Trump Hotel and discussing an agreement signed with the Venezuelans but has denied passing authorization from President Trump to Goudreau. *See* Schiller FBI Interview, DISC-101047–059. *See also* Goudreau's sworn statement of Oct. 20, 2020, at DISC–100983.

[32] FBI Interview, DISC-103493–494.

[33] DISC–103554.

While both Horn and Beardsley, in 2021–22 FBI interviews, clearly tried to distance themselves from Goudreau and his efforts, they substantially corroborate Goudreau's reasonable belief that he had the presidential authority conveyed by Keith Schiller.[34]  Alexander, aka "Drew" Horn was Associate Director of Policy in the Office of the Vice President.[35]  Horn told the FBI he obtained this job in Vice President Pence's office in the White House because "he was a military veteran with work experience in Afghanistan."  He later transferred to the Office of the Director of National Intelligence (ODNI).

Horn contacted Goudreau on December 9, 2019, via Signal, asking if Jason Beardsley had been in touch, indicating "We've war-gamed things out to the best of our ability, he's (Beardsley) got the next step."[36] On December 10, 2019, White House visitor logs show Beardsley attended a meeting with Joseph Wier, then-director of foreign military sales at the National Security Council (NSC). When Beardsley explained this to the FBI two years later, he said he *was* talking to someone at the NSC, but not about Goudreau.  Beardsley refused to "disclose the names of anybody he talked to in the NSC" and, apparently, the FBI did not pursue this further.[37]

Jason Beardsley currently serves in the Office of the Secretary for the Department of Veterans Affairs.  His published biography indicates he has the relevant background and experience to consult with Goudreau on a project of this nature:[38]

> Jason Beardsley joined the United States Navy in 1990, the Army Special Operations Forces in 1994 and the Joint Special Operations in 2005.  He has been deployed to Iraq, Africa, the West Bank and Gaza Strip.  He is an expert in Military intelligence, diplomatic security, foreign internal defense, unconventional warfare,

---

[34] *See* FBI Interview of Alexander Horn, DISC-101009–101025 (Sep. 7, 2021), Horn's Signal chats with Goudreau, DISC-100809–812; FBI Interview of Jason Beardsley, DISC-101036–041 (Feb. 16, 2022).

[35] *See*, e.g., DISC-100843, email from Horn to Hillary Batjer Johnson, Department of State (Mar. 26, 2020) (Part of Horn's efforts to assist with charges against General Cliver Alcala).

[36] Horn Signal Communication, DISC-100801.

[37] FBI Interview of Jason Beardsley, DISC-101039.

[38] Available at https://www.hillvets.org/team-7/jason-beardsley (last accessed Sep. 12, 2025).

and counterterrorism. He served as a special operations adviser for Concerned Veterans of America.

**On January 28, 2020, Horn and Goudreau met at P.J. Clark's Restaurant in Washington, D.C.**

In late January, there were follow-up meetings. **Goudreau** messaged **Horn** on January 25, 2020, at 11:43 A.M.:

> *"Hi Drew. I have been working very hard on the project. We have made a breakthrough. I will be in DC this week. It is important that we meet. Let me know what day is good for you. Thanks"*

Twenty-five minutes later, **Horn** responded **"*Let's do it.*"** A minute later, **"*Do you have any openings on Tuesday?*"** **Goudreau agreed** and two minutes later **Horn** suggested, **"*Can you do 3pm at P.J. Clark's!*"** **Horn appeared eager to have the meeting and even apologized for running ten minutes late.**[39]

At this face-to-face meeting, Horn and Goudreau further discussed Goudreau's plans, including licensing and ITAR, and, importantly, Horn told Goudreau that he did not *need* more than the authority he already had to "do what he needed to do" to accomplish his mission. Horn also made the comment that "we don't care how bloody it is, after [Guaidó is installed] the money will flow." Furthermore, there is little chance of confusion about what was discussed between Goudreau and ███████, Andrew Horn and Jason Beardsley, since by at least this point, all had seen and were familiar with the Guaidó Contract documents.

**A Week Later, President Juan Guaidó Was President Trump's Guest at a Joint Session of Congress.**

### State of the Union, February 4, 2020

A few months after the events of October 16, 2019, President Juan Guaidó traveled to Washington with an entourage. There, he was honored at the State of the Union address by

---

[39] Horn's Signal chats with Goudreau, DISC-100801–803.

President Trump, where Guaidó received a standing ovation from a joint session of Congress February 4, 2020, with the assembled Senators and Members of Congress, at the urging of the President, wildly cheering Guaidó's effort to replace the illegitimate Nicolas Maduro.  A brief video excerpt from this event published by the Public Broadcasting System illustrates this.  It is still available at  https://www.youtube.com/watch?v=tOibfOxrbd4.  The following morning, National Public Radio characterized the event as follows:  Franco Ordonez, *Venezuelan Opposition Leader Juan Guaidó Inspires Rare Bipartisan Moment* (Feb. 5, 2020).[40]



Venezuelan opposition leader Juan Guaidó's appearance at the State of the Union — as well as the bipartisan ovation he received — was intended to send a strong message of U.S. support for his efforts to unseat Venezuelan leader Nicolás Maduro.

Guaidó attended the address as a guest of the White House.

"Maduro is an illegitimate ruler, a tyrant who brutalizes his people, but Maduro's grip on tyranny will be smashed and broken," Trump said in his speech. "Here this evening is a very brave man who carries with him the hopes, dreams and aspirations of all Venezuelans. Joining us in the gallery is the true and legitimate president of Venezuela, Juan Guaidó."

Guaidó's visit to Washington comes after a rare trip outside Venezuela for an international tour aimed at increasing support for his push for new democratic leadership in Venezuela.

---

[40] Available at https://www.npr.org/2020/02/05/802850223/venezuelan-opposition-leader-juan-guaid-inspires-rare-bipartisan-moment.

Benjamin Gedan, former Venezuela director at the National Security Council
in the Obama administration, said Guaidó's presence sends a critical message
about U.S. commitment to solving the Venezuelan crisis.

Benjamin Gedan, former Venezuela director at the National Security Council
in the Obama administration, said Guaidó's presence sends a critical message
about U.S. commitment to solving the Venezuelan crisis.

"The symbolism is extraordinarily important," Gedan said. "Guaidó's relevance
as a figure in the Venezuelan opposition is entirely connected to his ability to
stay on the radar of the White House."

Guaidó received an extended bipartisan standing ovation. It was one of the few
times that House Speaker Nancy Pelosi and Democrats stood to applaud during
Trump's speech.

Support for Guaidó and his efforts to restore democracy in Venezuela is one of
the few administration policy priorities that have received sustained bipartisan
support.

"In our partisan times, we don't see a lot that both sides agree on," said
Fernando Cutz, former director for South America at the National Security
Council under Trump. "And Venezuela is one of those topics where
Republicans and Democrats agree."

Last year, the U.S. was the first country to recognize Guaidó as the legitimate
interim president of Venezuela. Since then, nearly 60 nations have also
recognized Guaidó as president.

But despite U.S. support, Guaidó has yet to inspire the Venezuelan people to
force Maduro from power. And current and former administration officials have
raised concerns that support for Guaidó had fallen at the White House.

Those concerns increased after the opposition failed to secure a meeting with
Trump during the World Economic Forum in Davos, Switzerland, and a rally
in South Florida.

"Trump's decision to snub Guaidó in Davos and Miami sent a troubling signal,"
Gedan said. "A year into his shadow presidency, Guaidó controls no territory
and has not moved the regime an inch toward ceding power. His only relevance
is his international recognition and his ties to the White House."

During his speech, Trump appeared to address those concerns. He told Guaidó
to take a message back to Venezuela from him and the American people.

"All Americans are united with the Venezuelan people in their righteous
struggle for freedom," Trump said.

**White House Meetings February 5, 2020**

The next day there was a meeting in the White House, as documented by former Defense Secretary Mark Esper in his memoir, MARK T. ESPER, A SACRED OATH: MEMOIRS OF A SECRETARY OF DEFENSE DURING EXTRAORDINARY TIMES at 299–303 (2022). Esper wrote he met with President Trump beforehand "trying to learn if the NSC had put any outlandish ideas in Trump's head." [41]

According to the then–Defense Secretary, in a subsequent meeting with Guaidó immediately following Esper's private meeting with President Trump, Trump asked Guaidó and the assembled group, "What if the U.S. military went down there and got rid of Maduro?" This was a question Esper wrote made him "wince," but he pressed Guaidó on his ability to organize an expatriate force.



Photograph of February 2020 Oval Office meeting with President Juan Guaidó. [42]

---

[41] National Security Council.

[42] Available at: https://images.squarespace-cdn.com/content/v1

/563a4585e4b00d0211e8dd7e/1581175546433-WH605B4RMJI49V9INANZ/Guaidó-trump-meeting-800x533.jpg (last accessed Feb. 3, 2025). This is the meeting depicted in former Defense Secretary Mark Esper's book, MARK T. ESPER, A SACRED OATH: MEMOIRS OF A SECRETARY OF DEFENSE DURING EXTRAORDINARY TIMES (2022), with the caption:

Then, out of the blue, one of Guaidó's colleagues looked at me from across the table and said something like "We have some plans you [the U.S. government] know we are working on, they're just not ready yet." There was some quick reference to Florida too.  As he finished the sentence, he smiled, looked away from [Esper], and made eye contact with [Mauricio] Claver-Carone, the NSC senior director [for the Western Hemisphere][43] who was pressing the hardest for military action. . .. Something was up. . . In early May 2020, two former U.S. Special Forces soldiers led a group of nearly sixty Venezuelan dissidents in a failed attempt ... Guaidó reportedly approved the operation. . .. [T]he U.S. government was not involved in this operation, to the best of my knowledge.  However, I often wondered if this was the plan referred to by Guaidó's team at the White House back in February and, if so, to what degree was the NSC aware and involved.

Secretary Esper believed that the NSC or others in the White House plotted and attempted some military action with Guaidó outside Defense channels.  Elsewhere in the book, Esper reports calling the CIA Director, Gina Haspell, who said the CIA was unaware of [Gideon] (she may have been unaware, but it is unlikely others in the Agency were in the dark).  The Secretary also elaborates on Mauricio Claver-Carone's very aggressive posture on intervention in South America and ties to the Cuban community in Miami.  At a bare minimum, in the context of this matter, it is logical to have questioned Mr. Claver-Carone, and the defendants presume this has happened, based on the other investigation that *was* conducted by the FBI.

--------------------------

President Trump met with the interim president of Venezuela, Juan Guaidó, in the Oval Office on February 5, 2020.  I listened closely, asked questions, and was on guard for any talk of military action against Caracas.  *The National Security Council seemed eager to employ military force against Venezuela, and I was concerned that such a predisposition could turn into a pre-election "October Surprise."*

(italics added).

--------------------------

[43] Recently named Special Envoy to Latin America.  *See* https://www.reuters.com/world/us/trump-picks-latin-american-envoy-previously-fired-alleged-misconduct-2024-12-22/.

**Both Horn and Beardsley Continued Their Involvement with Goudreau
during and after the State of the Union and White House meetings.**

On February 5, 2020, at 4:59 P.M., Beardsley texted Goudreau:[44]

*Hope things are good. It was great to see Juan* [Guaidó] *up there last night.*

Less than a minute later, Beardsley followed with:

*Let me know if there's a need to continue doing background work to get you*

*support.*

Goudreau responded at 10:57 P.M.:

*That would be great Jason.*

The next morning, February 6, 2020, at 8:51 A.M., Beardsley texted Goudreau:

Beardsley: *Let me know if you can re attack* (discuss your operation) *f2f* (face-to-

face) *Sometime* (sic)

Goudreau: *Ok*

>          *I have meetings in D.C. on the 14th*

>          *Will you be around?*

Beardsley: *Yes sir*

>     *Nine seconds later*

Beardsley: *I'll make time!*

Goudreau: *Ok great*


**On March 26, 2020, Goudreau Spoke and Messaged With Horn Concerning
the Indictment of General Cliver Alcala.**

---

[44] DISC-000414 at 8–10.

Horn offered to try to intercede when General Alcala.  Goudreau viewed Alcala as important in securing internal military backing for execution of the Guaidó Contract.  The general was indicted in March 2020 along with Maduro.[45]

Goudreau advised Horn of Alcala's indictment in a Signal chat March 26, 2020, and after Horn determined that the announcement had been made by Attorney General William Barr, he told Goudreau, at 11:41 A.M.,

Horn:  **"*Reaching out now.  This is a tough one, but I will do everything I can.*"**

Horn followed three minutes later with, **"*My guy at state is working it now,*"** and at 4:41 P.M. asked, **"*Do you want me to try to get DOJ to appeal the narco designation?*"**

Goudreau responded, "*Yes, please appeal the narco designation.*"

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████ ▪

The following day, March 27, 2020, Horn advised Goudreau that he had been unable to successfully intervene; **"*Hey brother, I pushed along my concerns on this to state/justice. They said he's on a plane to ny and they are tracking everything, not sure what that means but it's all I can do for now.*"**

**Thirty seconds later,** Horn followed up with: "*There is huge sensitivity with wh interference with doj right now so my hands are tied until I transition to dni on Monday.*" (Horn was not just making excuses.  *See, e.g.*, Peter Baker and Michael D. Shear, *How Trump's Relationship with Barr Got So Complicated*, N.Y. Times, Feb.14, 2020.

**A minute later,** Horn messaged**,** **"*Let's touch base next week if you still need assistance, and I'll see if I can do anything from there.*"**

**Goudreau responded two hours later:  "Ok Drew thank you."**

As Late as the Time of the Failed Invasion April 26–May 4, 2020, Horn and Goudreau Remained In Contact

---

[45] Horn's Signal chats with Goudreau, DISC-100804–809.
[46] FBI interview, DISC–101026—1029, at 1028 (May 6, 2021).

Exchanges between April 26 and May 4, 2020, indicate that Horn and Goudreau discussed the Venezuelan incursion and immediate requests by Goudreau:[47] Beginning April 26, 2020, at 9:21 A.M.:

Goudreau: *Hi Drew are you available for a call?*

Horn responded two days later, April 28, 2020, at 11:15 A.M. and the following exchange with Goudreau lasted until 11:25 A.M.

Horn: *Can you talk today or tomorrow?*

Goudreau: *Yes I can talk today*

Horn: *Does 3:45pm work?*

Goudreau initiated contact with Horn on May 3, 2020, at 7:49 P.M. and the following exchange lasted until 7:53 P.M.

Goudreau: *2 US ex green berets in Venezuela fighting alongside the men from earlier today*

Goudreau: *It's not a psi op*

Goudreau: *It's my op*

Goudreau: *I have 500 people in Colombia standing by but in need state department approval to send guns and ammo*

Horn: *Ok, let me work on it and see what I can do. I'll have an update tomorrow for you.*

Horn: *Can you do a call tomorrow afternoon?*

Horn: *Ok, let me work on it*

Horn: *Ok, let me see what I can do between now and then*

Goudreau: *Thank you*

Horn: *Of course*

Goudreau: *I have a 90 page contract with the opposition*

Goudreau messaged Horn a final time on May 4, 2020, at 3:00 P.M.

Goudreau: *My 2 were just captured*

---

[47] Horn's Signal chats with Goudreau, DISC-100809–812.

It is significant that a senior advisor in the Office of the Vice President, and close associate of both ███████ and Keith Schiller, [48] would involve himself in these efforts on behalf of General Alcala in late March 2020. Furthermore, Horn's representations to Goudreau about Horn's efforts to intervene on Alcala's behalf are corroborated by substantial email communications between Horn and various State Department and Department of Justice officials. Further, we believe it is significant that Horn was still communicating with Mr. Goudreau at the time of the failed invasion, supporting Goudreau's belief that he had the approval of the United States Government.

### KEITH SCHILLER Secured ITAR Registration in 2019.

Given the current charges against the defendants, it is also important to note that during the relevant time (2019), Mr. Schiller had correspondence with the United States Department of State concerning Schiller's registration, on behalf of his company, KS Global Group LLC as an arms broker. In a letter dated December 31, 2019, the State Department acknowledges receipt of Schiller's "registration statement and fee to register as an exporter," referencing his "registration statement" related to "engag[ing] in . . . either manufacturing or exporting defense articles or furnishing defense services . . . pursuant to the Arms Export Control Act (AECA) and the International Traffic in Arms Regulations (ITAR Part 122)." The letter identifies Schiller as the "senior officer empowered to sign the registration statement" and requests that he "maintain records consistent with ITAR Section 122.5 . . ."[49]

This is consistent with Goudreau's sworn statement and the statement of another likely defense witness—that Mr. Schiller was going to handle necessary licensing and permits for

---

[48] Horn continues to have a close association with Keith Schiller, in Horn's new role as the CEO of GREENMET, a strategic minerals investment company. At GREENMET, Schiller was listed as the single member on Horn's Board of Advisors as recently as August 26, 2025, but his name has since deleted from the website, currently available at https://greenmet.com/who-we-are/.

[49] DISC–100993–994.

military equipment with the involvement of Nestor Sainz and Alexander Horn.[50]   However, in his FBI interview, Schiller acknowledged he "had some experience with ITAR licenses and was registered as a [weapons] broker with the Department of State," was "familiar with the ITAR process and was registered for ITAR for future work" but that he "did nothing ITAR related with GOUDREAU."[51]

The purpose of providing the Court with this lengthy discussion of Mr. Goudreau's public authority defense is to establish that the information available to the defense is leaps and bounds away from what was available a year ago.  This information is verified and should carry a great deal of weight when considering the request in this Motion.

## **CONCLUSION**

Mr. Goudreau now has a strong connection to the Middle District of Florida.



Moreover, counsel has uncovered extensive information over the past year that supports Mr. Goudreau's public authority defense.  Mr. Goudreau is a good place ready.  He is fighting for his innocence.  He has no reason to flee and every reason to stay in the Middle District of Florida, resolve this case, and move on with his life.

WHEREFORE, based on the foregoing, Mr. Goudreau respectfully requests this Court grant his Motion to Modify Bond Conditions and remove Ms. Gatien as a personal surety on his bond.

Dated: September 19, 2025

---

[50] DISC–100964–965.  Horn, of course, ultimately told Goudreau on Jan. 28, 2020, at the "PJ Clark's meeting," that the authority Goudreau had been given (by President Trump) rendered ITAR licensing unnecessary.
[51] DISC–101053.

Respectfully submitted,

By: */s/ Marissel Descalzo*
**Marissel Descalzo, Esq.**
Florida Bar No. 028850
md@DescalzoLaw.com

Descalzo Law P.A.
One Biscayne Tower
2 South Biscayne Blvd., Suite 2530
Miami, Florida 33131
Telephone:    305-489-1018
*Counsel for Jordan Goudreau*

## <u>CERTIFICATE OF SERVICE</u>

I CERTIFY THAT, on this 19th day of September, 2025, the foregoing was electronically

transmitted via the Court's CM/ECF system.

By: */s/ Marissel Descalzo*
**Marissel Descalzo, Esq.**