UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                        Case No. 8:24-cr-330-VMC-CPT

JORDAN GUY MACDONALD GOUDREAU
_____/

## **REPORT AND RECOMMENDATION**

Before me on referral is the government's motion requesting the Court to declare Defendant Jordan Guy MacDonald Goudreau's bond forfeited, to set aside the bond forfeiture as to third-party surety Jennifer Gatien, and to enter a default judgment against Goudreau. (Doc. 275). Gatien responds in support of the government's motion (Doc. 277), while Goudreau—who has absconded—takes no position on the matter (Doc. 276).[1] For the reasons discussed below, I respectfully recommend that the government's motion be granted.[2]

---

[1] Goudreau—through his counsel—does, however, "reserve[ ] all rights to object to and move for reconsideration of any order entered by the Court concerning bond forfeiture or judgment, should [he] appear before th[e] Court in the future." (Doc. 276 at 2).

[2] The propriety of a magistrate judge entering a final order regarding forfeiture of a bond is not settled in this Circuit. *See United States v. Alrahib*, 627 F. Supp. 3d 1288, 1294 n.1 (S.D. Fla. 2022) ("Although at least one circuit has held that a forfeiture ordered by a magistrate judge is valid if adopted by the district court, the Eleventh Circuit has not addressed the issue of a magistrate judge's authority to declare a bond forfeited.") (citation omitted), *aff'd*, 2024 WL 4298263 (11th Cir. Sept. 26, 2024) (per curiam); *see also United States v. Bayorh*, 2006 WL 8429708, at *1 n.3 (N.D. Ga. Oct. 25, 2006) (finding that the magistrate judge was not empowered to enter a final judgment of forfeiture or a default judgment), *report and recommendation adopted*, 2007 WL 9676969 (N.D. Ga. May 24, 2007). Given the lack of any definitive Eleventh Circuit case law on this question and in an abundance of caution, I will proceed by way of a report and recommendation (R&R) rather than by way of an order.

I.

The background of this case is well-known to the Court but bears repeating here. In mid-July 2024, Goudreau was charged in an indictment with various firearms- and smuggling-related offenses, including violations of the Export Control Reform Act, 50 U.S.C. § 4819; violations of the Arms Export Control Act, 22 U.S.C. § 2778; and violations of 18 U.S.C. §§ 554, 922(o). (Doc. 1). These charges stemmed from a May 2020 armed incursion of Venezuela known as "Operation Gideon," which was allegedly led in part by Goudreau—a former Green Beret—to remove then-president Nicolas Maduro from power. *Id.*

Goudreau was arrested on these charges in late July 2024 and was ultimately released by the Court subject to a series of stringent conditions, including home detention with GPS monitoring, relinquishment of his passport, and—of import here—a $2 million bond secured by the New York City residence of Goudreau's "close friend," Gatien. *See* (Docs. 57–59). The Court set these conditions following a lengthy hearing, at which Gatien and a third-party custodian, Ryan Reeves, appeared and "extensively assured" the Court that they were "willing and able to be responsible for" guaranteeing Goudreau's attendance at all future proceedings. (Doc. 59 at 12). Reeves—a retired Green Beret himself, who served with Goudreau in Afghanistan and who viewed Goudreau like a "brother"—agreed to have Goudreau live with Reeves and his family at their home in Freeport, Florida. *Id.* at 12–13. Goudreau and Gatien thereafter signed the $2 million appearance bond, attesting that they understood Gatien's property would be forfeited if Goudreau did not abide by his release

2

conditions. (Doc. 57 at 1). The appearance bond further warned Goudreau and Gatien:

> The [C]ourt may immediately order the amount of the bond surrendered to the United States, including the security for the bond, if [Goudreau] does not comply with the agreement. At the request of the United States, the [C]ourt may order a judgment of forfeiture against [Goudreau] and [Gatien] for the entire amount of the bond, including interests and costs.

*Id*.

Over the course of the next year or so, Goudreau largely adhered to his release conditions. Indeed, his behavior on release was sufficiently compliant that the government did not oppose several requests by Goudreau to travel both within and outside this District. *See* (Docs. 115, 127, 147, 158).

During this roughly year-long period, Goudreau also asked that the Court permit him to reside at the Veterans Affairs' (VA) Mental Health Residential Rehabilitation Treatment Program in Tampa, Florida. (Doc. 164-2). To buttress this request, Goudreau asserted that this living arrangement would enable him to receive services from the VA and to participate in the Veterans Treatment Court pilot program run by Colonel Darryl J. Reyes. *Id.* With the government's blessing, the Court granted Goudreau's request to reside at the VA but cautioned him that he would be subject to the previously imposed release conditions once he completed the program. (Doc. 165).

Approximately four months after being permitted to live at the VA, in September 2025, Goudreau sought to have his release conditions modified to remove Gatien as a surety. (Docs. 176, 179-1, 180). Goudreau contended that this change was warranted for, among other reasons, the strength of his public authority defense to the charges against him and the mentorship and supervision he had received from Colonel Reyes. (Docs. 179-1, 180). That same month, Gatien filed a motion for release from the appearance bond as well, claiming, inter alia, that Goudreau had made "numerous statements that he d[id] not intend to return to prison," that he had issued verbal and written "threats against . . . Gatien should she attempt to withdraw as the surety," and that he would also seek "to elicit false and defamatory declarations from third-party witnesses to present against . . . Gatien should she offer testimony" against him at a future bond hearing. (Doc. 185 at 1–4). For its part, the government asserted that the Court should reopen Goudreau's detention hearing and revoke his bond. (Docs. 187, 196).

After receiving additional submissions from the parties, *see, e.g.,* (Docs. 204–206), I convened an evidentiary hearing on October 29, 2025, to address Goudreau's and Gatien's motions. During the hearing, which spanned more than two days, Gatien reiterated that she believed Goudreau intended to flee based on his conduct and his statements that he would not return to jail. *See, e.g.,* (Doc. 272 at 59, 66–67, 74–77, 87, 98–99); (Doc. 273 at 25, 37–40, 47–50). Gatien also reiterated that Goudreau repeatedly said he would abscond if she tried to "pull the bond." (Doc. 272

at 76).[3]  Gatien's concerns about Goudreau's plan to disappear were bolstered by another witness, who likewise attested that Goudreau said he would flee before going to jail.  (Doc. 273 at 103, 120–121).  The witness added that Goudreau even attempted to obtain a false declaration from another individual to avoid prison.  *Id.* at 121.

At the end of the second day of the hearing, defense counsel advised that Goudreau needed to transition soon from the VA facility where he was living to a bed at the Salvation Army, although he would remain under the VA's supervision the whole time.  *Id.* at 143–44.  As result of this development, I continued the hearing until 2:00 p.m. the next day, October 31.  (Doc. 231).  The purpose of this continuance was to allow the government to review defense counsel's proposed arrangement with the VA and the Pretrial Services office and to enable Goudreau to call a witness from the VA regarding the specifics of the arrangement and "why it[ was] the functional equivalent . . . [of] what [wa]s in place" already.  (Doc. 273 at 145).

The next morning, the government filed a motion to detain Goudreau.  (Doc. 229).  When I reconvened the hearing that afternoon, Goudreau was not present. (Doc. 274 at 3).  In response to my inquiries, defense counsel confirmed that Goudreau knew the date and the time of the continued hearing and that she had been in contact with Goudreau that day regarding his housing situation.  *Id.* at 3, 5.  Given Goudreau's failure to attend the proceeding, I issued a warrant for his arrest.  (Doc. 236).

---

[3] There was additional evidence tendered at the hearing that Goudreau did not honor certain representations he made to Gatien in connection with the bond.  *See* (Doc. 272 at 32, 46–47, 127).

Once the proceeding concluded, the government immediately attempted to locate Goudreau to no avail. (Doc. 275 at 5). It later learned that Goudreau checked out of the VA quarters where he was residing roughly an hour before the 2:00 p.m. proceeding on October 31 and that his ankle monitoring device was found hidden at the VA wrapped in aluminum foil. *Id.*

In January 2026, when it became apparent that the arrest of Goudreau was not imminent, I sua sponte entered a Notice scheduling a status conference to discuss the parties' pending motions. (Doc. 257). Following that status conference, I denied the parties' motions as moot (Docs. 259, 261, 262) and established a briefing schedule to address Gatien's request that she be released from the appearance bond (Doc. 263). The parties have since filed their respective submissions in accordance with the Court's briefing schedule, and the matter is thus now ripe for the Court's consideration.

II.

A.

"An appearance bond is a contract between the government on one hand and a principal and his surety on the other." *Alrahib*, 2024 WL 4298263, at *3 (internal quotation marks and citation omitted). "The purpose of [an appearance] bond is to secure the presence of the defendant to answer any charge or charges against him, and to respond to the judgment of the court, while . . . afford[ing] the defendant freedom from harassment and confinement before he is proven guilty of the offense charged." *United States v. Diaz*, 811 F.2d 1412, 1415 (11th Cir. 1987) (citation omitted); *see also*

*United States v. Velez*, 693 F.2d 1081, 1084 (11th Cir. 1982) ("[T]he true object of a bond is to secure the presence of the defendant.").

"Federal Rule of Criminal Procedure 46 governs the setting and revocation of bonds." *Alrahib*, 2024 WL 4298263, at *3 (citing Fed. R. Crim. P. 46(f)(1)). Under that rule, "a court *must* declare a bond forfeited if any conditions are breached." *Alrahib*, 2024 WL 4298263, at *3. When a bond is forfeited, liability extends not only "to the defendant but also as to any surety on the bond." *United States v. Urdaneta-Gonzalez*, 2019 WL 538353, at *1 (M.D. Fla. Jan. 25, 2019) (citing *United States v. Vaccaro*, 51 F.3d 189, 193 (9th Cir. 1995) (deeming the defendant and the surety to be jointly and severally liable for forfeiture); *United States v. Balbuena*, 2009 WL 87413, at *1 (M.D. Fla. Jan. 13, 2009) (same)).

If a court declares a bond to be forfeited, it may set aside the bond forfeiture in whole or in part if "the surety later surrenders into custody the person released on the surety's appearance bond," or—of significance here—"it appears that justice does not require bail forfeiture." Fed. R. Crim. P. 46(f)(2). A court may also set aside the bond only as to a surety and not as to the defendant. *See United States v. Jimenez*, 2025 WL 2178456, at *7 (D. Conn. Mar. 7, 2025) (setting aside forfeiture of an appearance bond against four sureties but enforcing the bond against the defendant).

If a court does not set aside a bail forfeiture, it must enter a default judgment upon the government's motion. Fed. R. Crim. P. 46(f)(3)(A). After entering such a judgment, however, a court may remit the judgment in whole or in part based upon

7

the same justifications for setting aside a bond forfeiture.  *See United States v. Gonzalez*, 452 F. App'x 844, 845 (11th Cir. 2011) (per curiam) (citing Fed. R. Crim. P. 46(f)(4)).[4]

The "equitable nature" of the power to set aside a bond forfeiture or to remit a forfeiture judgment endows a court with wide latitude to determine the appropriateness of such remedies.  *Velez*, 693 F.2d at 1083 (citation omitted).  Indeed, the Eleventh Circuit has stated that a court has "virtually unbridled discretion" in deciding this question.  *Gonzalez*, 452 F. App'x at 845 (citation omitted).

In *Diaz*, the Eleventh Circuit set forth the framework that courts should employ in evaluating whether to set aside a bond forfeiture or to remit a forfeiture judgment under Rule 46.[5]  *See Diaz*, 811 F.2d at 1415.  The "general method" of resolving this issue, the court explained, is to ascertain if the bond forfeiture or forfeiture judgment bears any "reasonable relation" to the following factors:

> 1) the cost and inconvenience to the government in regaining custody of the defendant,
> 2) the amount of delay caused by the defendant's default and the stage of the proceedings at the time of his disappearance,
> 3) the willfulness of the defendant's breach of conditions and the prejudice suffered by the government, and
> 4) the public interest and necessity of effectuating the appearance of the defendant.

---

[4] Unpublished opinions are not considered binding precedent but may be cited as persuasive authority.  11th Cir. R. 36-2.

[5] *Diaz* involved a prior version of Rule 46, in which the subdivision now designated as Rule 46(f) was denominated as Rule 46(e).

*Id.* (quoting *United States v. Parr*, 594 F.2d 440, 444 (5th Cir. 1979)).

While these so-called *Diaz* factors are helpful, they are not exhaustive. *See Alrahib*, 2024 WL 4298263, at *3 (observing that the *Diaz* factors are not exclusive); *Gonzalez*, 452 F. App'x at 845 ("Courts have refused to specifically emphasize any of the[ *Diaz*] factors, nor are they the only factors that may be relevant.") (citing *Diaz*, 811 F.2d at 1415 n.2). By way of example, a court may consider any "mitigating factor" or "whether the surety is a professional as opposed to family member or friend." *United States v. Cureton*, 2016 WL 11000018, at *2 (S.D. Ga. Mar. 10, 2016) (citing *Diaz*, 811 F.2d at 1415; *United States v. Nguyen*, 279 F.3d 1112, 1115–16 (9th Cir. 2002)). One factor a court may not take into account, however, is the financial hardship a bond forfeiture or forfeiture judgment will impose on a surety. *See Alrahib*, 2024 WL 4298263, at *3 (stating that the Eleventh Circuit "has made it clear that the movant's 'financial plight' is not a valid consideration") (quoting *Diaz*, 811 F.2d at 1415 n.2, 1416).

Another caveat with respect to the *Diaz* factors is that they are of limited value where, as here, a defendant is not in custody. *See Diaz*, 811 F.2d at 1415 ("[T]he fact that [the defendant disappeared and] remains unaccounted for makes any application of the[ *Diaz*] factors untenable."); *Velez*, 693 F.2d at 1083 (commenting that the *Diaz* are "not particularly applicable" where the defendant has absconded and has not been located) (citation omitted). This does not mean, however, that a court cannot exercise

9

its equitable power to set aside a bond forfeiture or to remit a forfeiture judgment if a defendant has fled.

The Eleventh Circuit's opinion in *Velez* is instructive in this respect. In that case, the trial court directed that the surety's obligation be reduced from $60,000 to $30,000 in response to a motion by the defendant to lower the bond amount. *Id*. at 1082. Due to a mix-up, however, the trial court later ordered the forfeiture of the full $60,000 when the defendant disappeared. *Id.* at 1082–83.

On appeal, the Eleventh Circuit vacated the trial court's ruling, finding that it was "patently unjust" and thus an abuse of discretion. *Id.* at 1083–84. Highlighting the "unusual circumstances" before it, the court reasoned that the goal of securing the presence of the defendant would not be furthered by "exacting an obligation on a bondsman much greater than the amount he reasonably believed was his responsibility." *Id*. at 1084 & n.7. In reaching this conclusion, the court did not look to the *Diaz* factors and instead relied on the "equitable nature" of the remedies available to it under Rule 46. *Id.* at 1083. The court cautioned, however, that its "holding d[id] not generally sanction the remission of a forfeited bond when the defendant has not reappeared," as doing so in "most" such instances "would undermine the purpose of bail bonds." *Id*. at 1084 n.7 (citation omitted).[6]

---

[6] The Eleventh Circuit echoed this cautionary note five years later in *Diaz*, observing that at least as of the date of the *Diaz* decision in 1987, it had "never granted remission based on circumstances surrounding the defendant's disappearance while said defendant was not accounted for." *Diaz*, 811 F.2d at 1416. Of relevance here though, the *Diaz* court justified its ruling, in part, by pointing out that an assessment of the equities would be "more readily available" once the defendant in that case "surfaced." *Id*.

B.

With this backdrop in mind, I proceed to the relief sought by the government—namely, forfeiture of the bond, setting aside the bond forfeiture solely as to Gatien, and entering a default judgment against Goudreau in the amount of $2,000,000. (Doc. 275). Each of these forms of relief will be addressed in turn.

The government's bid to have the $2 million bond forfeited is predicated on Goudreau's failure to attend the October 31, 2025, proceeding. *Id.* This request is well-founded. As described above, Goudreau's bond dictated that he appear at court hearings as a condition of his release. (Docs. 57, 58). Because Goudreau clearly contravened this condition by disappearing before the October 31 hearing, the Court "must" order forfeiture of the $2 million bond. *See* Fed. R. Crim. P. 46(f)(1).

The government's request that the bond forfeiture be set aside only as to Gatien—who is jointly and severally liable "for the entire amount of the bond" (Doc. 57 at 1)—likewise has merit. As discussed previously, Rule 46 authorizes a court to grant such relief if "it appears that justice does not require" enforcement of the bond forfeiture. Fed. R. Crim. P. 46(f)(2). Here, there are multiple reasons it would be inequitable not to set aside the bond forfeiture as to Gatien.

To begin, Gatien came forward on her own accord and at considerable expense to notify the Court that Goudreau would flee rather than be imprisoned. Moreover, she did so despite Goudreau's persistent threats that he would abscond if she tried to "pull the bond" or, at the very least, that he would compile "false and defamatory declarations from third-party witnesses" attacking her if she contemplated testifying

11

against him at a bond hearing. (Doc. 185 at 2). As the government emphasizes, "[i]n sounding the alarm" in the face of such intimidation, Gatien—"acting as a de facto third-party custodian"—admirably sought "to alert the Court of [Goudreau's] nefarious intentions" in an attempt to prevent him from acting on them. (Doc. 275 at 8).[7]

Nor is there any basis to believe that Gatien had any involvement in Goudreau's eventual disappearance. *See United States v. Thigpen*, 2015 WL 4068587, at *3 (S.D. Ga. July 2, 2015) (setting aside the forfeiture of a bond as to the defendant and his surety in part because the surety did not seem "to be responsible for [the defendant's] violations of his pretrial release conditions, and he certainly did not participate in [the defendant's] admitted violations"). Quite the opposite. As explained previously, Gatien did everything she reasonably could to stop Goudreau from fleeing. *See Velez*, 693 F.2d at 1083–84 (setting aside the bond forfeiture for a surety who fulfilled his responsibilities and was otherwise "blameless"). In light of all Gatien's efforts, leaving her "to hold the bag" at this point would—as the government contends—be a "miscarriage of justice." (Doc. 275 at 10).

---

[7] Contrast these facts with those in *Alrahib*. In that case, the defendant violated "key conditions" of his pretrial release order, including attempted witness tampering, employment restrictions, and house arrest. *Alrahib*, 2024 WL 4298263, at *1. On the government's motion, the district court ordered the forfeiture of the defendant's $2.5 million in bonds, which were secured by both a corporate surety and two individuals. *Id.* at *1–2. Following the defendant's conviction, the sureties sought remission of the $2.5 million based, in part, on their lack of involvement in his violations. *Id.* at *2. The district court denied the sureties' requests, and the Eleventh Circuit upheld that ruling on appeal. Importantly, unlike Gatien here, the sureties in *Alrahib* did not make any effort to release themselves from the appearance bond in anticipation of the defendant's violations. In fact, the government alleged that the sureties actually profited from the defendant's fraud while on pretrial release. *Id.* at *2.

Furthermore, setting aside the bond forfeiture would neither "undermine the purpose of bail bonds," *Velez*, 693 F.2d at 1084 n.7, nor dissuade sureties from "tak[ing] their obligations seriously," *Alrahib*, 2024 WL 4298263, at *4. To the contrary, it would encourage sureties to disclose violations of their defendants' release conditions and thus make it more likely that defendants would have "to answer . . . [the] charges against [them], and to respond to the judgment of the court[s]," *Diaz*, 811 F.2d at 1415, which—as noted earlier—is "the true object of a bond." *Velez*, 693 F.2d 1084; *see also* (Doc. 277 at 5) (asserting that forfeiting Gatien's collateral at this juncture "would incentivize sureties to remain compliant and complicit with a defendant's misconduct, if such complicity protected their collateral").

Nor is this a situation where the Court needs to wait until Goudreau "surfaces" to assess the "willfulness of his breach" or where "the equities lie." *Diaz*, 811 F.2d at 1415–16. Regarding the former concern, it is now obvious given all that has happened that Goudreau schemed in advance how he would escape and that he deliberately put that plan into action when he felt the Court might soon revoke his bond based on the evidence introduced at the hearing. *See* (Doc. 273 at 38) ("[Goudreau] has a Plan B. He's a military guy. He's told me himself he will always have a Plan B."); *see also* (Doc. 272 at 86) ("[Goudreau] said . . . 'I will not go back to jail. I'll leave. I'll kill myself. I'm not going back.'"); (Doc. 273 at 103) ("Goudreau told my husband on the phone[ that he would] . . . never go[ ] back to jail[ and that he would] . . . kill [him]self first."). As such, this is not a case like *Diaz* where it was a "mystery" whether the

13

defendant disappeared due to "stag[ing] his own kidnapping" or being "forcibly abducted." *Diaz*, 811 F.2d at 1415.

As far as deciding on which side the equities fall, there is little question that they favor setting aside the bond forfeiture as to Gatien. Gatien went above and beyond her duties as a surety, and it is evident from the testimony at the hearing that she would have sought to remove herself as surety well before Goudreau's escape on October 31, 2025, if not for Goudreau's continual harping that she not "pull the bond" and his threats that he would use third-party witnesses to defame her. Furthermore, it is also apparent that enforcing the bond forfeiture against Gatien at this stage would redound to Goudreau's benefit, at least in part. The evidence admitted at the hearing revealed that Goudreau and Gatien's friendship ended well before the hearing and that there was a great deal of acrimony between the two by the time that proceeding commenced. It is reasonable to assume that Goudreau's animosity towards Gatien was only exacerbated by her hearing testimony, which portrayed him in a very negative light and severely undercut his claims that he should remain on bond. Under these circumstances, forfeiting Gatien's collateral—as Gatien posits—would be a "boon" to Goudreau by "exonerat[ing] his own debt to the government" and "satisfy[ing] his own personal vendetta against" Gatien. (Doc. 277 at 6).[8]

---

[8] It bears underscoring that the hearing addressed many, if not all, of the equitable considerations which are now at issue. *See Diaz*, 811 F.2d at 1414 ("The determination of whether or not to allow an evidentiary hearing [relative to a request to remit an appearance bond forfeiture judgment] is within the broad discretionary powers of the district court. . . .  As long as the district court judge has all the necessary facts to make a just and equitable determination of the . . . [matter], there is no point in further belaboring the court system.") (citation omitted).

Lastly, it should not be overlooked that it is the prosecutor, not Gatien, who is seeking to set aside the bond forfeiture as to her. This is notable because several components of the *Diaz* analysis specifically focus on the impact such relief would have on the government. *Diaz*, 811 F.2d at 1415. While the government avers that the costs and inconvenience of attempting to locate Goudreau will be significant and that Goudreau's absence materially prejudices the government's ability to prosecute the case, it nonetheless filed the instant motion to avoid what it has described would be a "miscarriage of justice." (Doc. 275 at 10). This action by the government speaks volumes, especially since the government is arguably in the best position to evaluate those elements of the *Diaz* factors that directly relate to it.

This brings me to the government's third and final request that the Court enter a default judgment against Goudreau in the amount of $2,000,000. This relief is also appropriate in light of the particular circumstances of this case, including Goudreau's threatening and manipulative behavior towards the surety, Gatien, as well as his deliberate and premediated flight from justice. *See* Fed. R. Crim. P. 46(f)(3)(A) ("If it does not set aside a bail forfeiture, the court must, upon the government's motion, enter a default judgment.").

III.

Based upon the foregoing, I respectfully recommend that:

1.      The government's motion asking the Court to declare Goudreau's bond forfeited, to set aside the bond forfeiture solely as to Gatien, and to enter a default judgment against Goudreau (Doc. 275) be granted.

15

2.      The bond be forfeited.

3.      The forfeiture be set aside as to Gatien.

4.      A default judgment be entered against Goudreau and in favor of the United States for the full amount of the appearance bond (i.e., $2,000,000) and any accrued interest to be immediately due and payable thereon.

Respectfully submitted this 8th day of June 2026.

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

Copies to:
Counsel of Record