**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

v. Case No. 8:24-cr-330-VMC/CPT

JORDAN GUY MACDONALD GOUDREAU,

Defendant.

---

# JENNIFER GATIEN'S MOTION FOR SANCTIONS

Jennifer Gatien respectfully moves for sanctions and an award of reasonable attorney's fees against defense counsel Marissel Descalzo pursuant to 28 U.S.C. § 1927 and, in the alternative, the Court's inherent authority.

## INTRODUCTION

Marissel Descalzo ("Descalzo") defended her client, Jordan Guy Macdonald Goudreau ("Goudreau" or "Defendant"), vigorously at the October 2025 bond hearings, and Jennifer Gatien ("Gatien" or "Surety") does not ask the Court to sanction vigorous advocacy. This motion is narrower. It rests on four episodes in which Descalzo took positions that her own knowledge contradicted. (1) She denied any collateral arrangement existed, though she had confirmed it in writing and held Goudreau's property in her safe. (2) She questioned Gatien as though a November 2024 Zoom call about the arrangement had not occurred, though she had attended it. (3) She told the Court that Gatien's warnings were the product of a failed relationship and "anger and resentment," though her own

communications showed otherwise. And (4) she pressed for the release of firearms her client was barred from possessing to an unverified courier, refused to tell the government where they were going, and then blamed the Surety for the episode.

Descalzo also concealed why the Court's custodial arrangement had ended, altered the substance of a text message to cast the Surety as a liar, asserted a privilege she conceded the next day had no support, and cross-examined Gatien about Goudreau's gold assets without disclosing that she had received a portion of the same. This Court later found that the Surety "did everything she reasonably could to stop Goudreau from fleeing." Doc. 289 at 11–12.

## FACTUAL BACKGROUND

**A. The Bond and the Collateral Arrangement.** Gatien posted a $2 million appearance bond for Goudreau and pledged her home as security. Doc. 57; Doc. 289 at 2-3. In connection with the bond, she required Goudreau to provide collateral, including cryptocurrency, to be held by Descalzo. Oct. 29, 2025 Hr'g Tr. at 40–41, 45–47, 153–55; Doc. 238-1. The Court released Goudreau on two safeguards: the bond and the custody of Ryan Reeves. Doc. 289 at 2–3. By the spring of 2025, the Reeves arrangement had collapsed, and the Court later permitted Goudreau to reside at the VA, a placement for which Gatien had advocated. Doc. 238-10; Oct. 29, 2025 Hr'g Tr. at 7, 58; Oct. 30, 2025 Hr'g Tr. at 78–79; Doc. 289 at 3. Descalzo never told the Court that the custodial arrangement could no longer be met. Oct. 29, 2025 Hr'g Tr. at 69. For six months, of the two safeguards underlying the Court's release order, only Gatien's bond remained operative.

**B. The September 2025 Filings.** On July 1, 2025, Gatien wrote to Descalzo that she had to call someone "to not lose my home." Doc. 238-14; Oct. 29, 2025 Hr'g Tr. at 66–67. When she concluded that she could no longer remain as the surety in the face of escalating risks, her counsel conferred with Descalzo on September 17 and offered her the opportunity to seek the Surety's removal on the Defendant's own terms. Doc. 185 ¶ 1. Descalzo then moved to modify Goudreau's release conditions, relying on, among other things, his public authority defense and Colonel Reyes's supervision. Doc. 289 at 4. On September 24, Goudreau asked Jason and Brande Woolems to sign statements against Gatien so that he could "burn her eyes out in court." Doc. 238-33 ¶ 16; Oct. 30, 2025 Hr'g Tr. at 121. On September 27, Brande Woolems reported that attempt to Descalzo in writing. Doc. 238-31 at 3–5. On September 30, Gatien moved to be released from the bond, citing Goudreau's solicitation of false declarations, his threats, his repudiation of the collateral safeguards, and her belief that he would flee. Doc. 185. That same day, Descalzo told the government that there was "no side agreement" and "I really don't know what she is talking about." Doc. 238-28. On October 3, she acknowledged the Woolems' report, and on October 9, she filed her response to the Surety's motion. Doc. 238-31 at 3–5; Doc. 192.

**C. The Hearings, Goudreau's Flight, and the Court's Findings.** The Court held evidentiary hearings on October 29 and 30, 2025. On October 31, Goudreau failed to appear. Doc. 289 at 5. The government moved to declare the bond forfeited but to set aside forfeiture as to Gatien because she gave timely notice of Goudreau's intent to violate the bond, sounded the alarm, and acted as a de facto

third-party custodian. Doc. 275 at 8–9. Magistrate Judge Tuite agreed, finding that Gatien had come forward "on her own accord and at considerable expense to notify the Court that Goudreau would flee rather than be imprisoned." Doc. 289 at 11–12, 15–16. No party objected, and on June 23, 2026, the Court adopted the report and set aside the forfeiture as to Gatien. Doc. 293.

## LEGAL STANDARD

Title 28, United States Code, Section 1927 provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

Under Eleventh Circuit precedent, § 1927 awards can include not only the excess costs of the underlying proceeding, but also the recovery of attorney's fees expended in bringing a motion under § 1927. *Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1298-1302 (11th Cir. 2010). The Eleventh Circuit has established three elements for a § 1927 sanction: (1) the attorney engaged in unreasonable and vexatious conduct; (2) that conduct multiplied the proceedings; and (3) the amount of the sanction cannot exceed the costs occasioned by the objectionable conduct. *Schwartz v. Millon Air, Inc.*, 341 F.3d 1220, 1225 (11th Cir. 2003) (citing *McMahan v. Toto*, 256 F.3d 1120, 1128 (11th Cir. 2001)); see also *Peterson v. BMI Refractories*, 124 F.3d 1386, 1396 (11th Cir. 1997).

Bad faith is the "touchstone" of a § 1927 award, but the Eleventh Circuit applies an *objective* standard. *Schwartz*, 341 F.3d at 1225, 1227. "Bad faith turns not on the attorney's subjective intent, but on the attorney's objective conduct;" thus,

the district court must compare the attorney's conduct against the conduct of a reasonable attorney. *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1239–42 (11th Cir. 2007). An attorney's conduct may also be "tantamount to bad faith" where she either carelessly or deliberately conceals evidence. *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1544 (11th Cir. 1993); *see also Amlong*, 500 F.3d at 1239–40 (defining "vexatious" as "without reasonable or probable cause or excuse; harassing; annoying"). Mere negligence is not enough; the attorney must have "knowingly or recklessly pursue[d] a frivolous claim" or "needlessly obstruct[ed] the litigation of a non-frivolous claim." *Amlong*, 500 F.3d at 1242; *Schwartz*, 341 F.3d at 1225. And "although the attorney's objective conduct is the focus of the analysis, the attorney's subjective state of mind is frequently an important piece of the calculus." *Amlong*, 500 F.3d at 1241. Nor may counsel rely on a client's patently incredible explanation when any reasonable investigation would reveal its implausibility. *Norelus*, 628 F.3d at 1300.

Importantly, courts may consider the totality of circumstances and may find bad faith from conduct considered as a whole. *In re Engle Cases*, 283 F. Supp. 3d 1174, 1225 (M.D. Fla. 2017). Section 1927 applies to post-filing conduct and reaches more than written pleadings; oral statements and litigation tactics at hearings are relevant. *Id.* at 1225. Finally, sanctions require a "financial nexus to the excess proceedings," thus fees should be limited to fees reasonably attributable to the offending conduct. *Amlong*, 500 F.3d at 1239; see also *Peterson*, 124 F.3d at 1396.

The Court also possesses inherent authority to sanction bad-faith litigation conduct that abuses the judicial process. "[A] court may exercise this power 'to

sanction . . . a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017) (quoting *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 382 (2013)). "The dual purpose of this power is to vindicate judicial authority without resorting to a contempt of court sanction and to make the prevailing party whole." *Id.* (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991)). "[T]he inherent-powers standard is a subjective bad-faith standard," which may rest on circumstantial evidence. *Id.* at 1223–25. The Surety invokes it only in the alternative, to the extent the Court concludes that particular bad-faith conduct falls outside § 1927.

**TIMELINESS**

**A. Local Rule 7.01 Does Not Govern a § 1927 Motion.** This motion is timely. Local Rule 7.01(b) requires a party claiming fees to move for a determination of entitlement "[w]ithin fourteen days after entry of judgment." M.D. Fla. L.R. 7.01(b). That rule does not reach this motion. Local Rule 7.01 implements Federal Rule of Civil Procedure 54(d)(2), as the Local Rules' reference tables confirm, and Rule 54(d)(2)(E) provides that subparagraphs (A) through (D) "do not apply to claims for fees and expenses as sanctions for violating these rules or as sanctions under 28 U.S.C. § 1927." Fed. R. Civ. P. 54(d)(2)(E). The Local Rules' criminal reference table does not list Local Rule 7.01 at all. And the rule governs claims for "a post-judgment attorney's fee," M.D. Fla. L.R. 7.01(a), not sanctions against opposing counsel for conduct during the bond proceeding. The Eleventh Circuit has accordingly confirmed that "motions for sanctions under § 1927 are not subject to this 14-day deadline," although a district court may set a deadline by order.

*Smith v. Psychiatric Sols., Inc.*, 750 F.3d 1253, 1261 (11th Cir. 2014). The only deadline that barred the motion in *Smith* was the district court's scheduling order, and the movant there sought leave 21 months after that deadline. *Id.* at 1261–62. No comparable order was entered here. Doc. 293.

**B. The Motion Was Filed Within a Reasonable Time.** Absent a court-imposed deadline, the Eleventh Circuit has recognized that requests for fees collateral to the merits "may be made by a motion within a reasonable period of time after the final judgment," and that "[t]he reasonableness of the filing period is determined by reviewing the prejudice" to the opposing party. *Baker v. Alderman*, 158 F.3d 516, 523 (11th Cir. 1998). Sanctions motions are collateral to the underlying action and are not barred merely because they follow the dispositive order. *Id.*

The reasonable period runs from the Court's resolution of the bond matter, not from the October 2025 hearings. The Surety's request for release was a single, continuous matter from her original motion through the Court's order adopting the report and recommendation, and the Court tied its ruling to the October 2025 record. Docs. 185, 263, 289, 293; Doc. 289 at 14 n.8. While the Surety's exposure on a $2 million bond remained undecided, a sanctions motion against defense counsel would have diverted the Court's attention from the forfeiture question and risked the appearance of a tactical filing.

This motion follows the July 2, 2026, entry of judgment against Goudreau, Doc. 296, by roughly four months—a fraction of the 21-month delay in *Smith*.

Descalzo can claim neither surprise nor prejudice. The conduct occurred on the record before this Court, and the transcripts and filings remain available.

**C. Alternatively, the Court Should Excuse Any Delay.** If the Court concludes that a deadline applied and has run, the Surety moves for relief under Local Rule 1.01(b), Federal Rule of Civil Procedure 6(b)(1)(B), and Federal Rule of Criminal Procedure 45(b)(1)(B). Each excusable-neglect factor favors her: Descalzo suffers no prejudice; the delay is modest and disrupts no proceeding; the Surety reasonably awaited resolution of her own exposure before assembling the record and segregating recoverable fees; and the Court's adopted findings confirm her good faith. *See Advanced Estimating Sys., Inc. v. Riney*, 77 F.3d 1322, 1325 (11th Cir. 1996); Doc. 289 at 11–14; Doc. 293.

## ARGUMENT

### A. The Surety May Seek Relief Under § 1927.

Section 1927 reaches conduct "in any case," and it does not limit recovery to named parties; it looks to who "reasonably incurred" the excess costs. 28 U.S.C. § 1927. An appearance bond is "a contract between the government on one hand and a principal and his surety on the other." *United States v. Alrahib*, 2024 WL 4298263, at *3 (11th Cir. Sept. 26, 2024) (internal quotation marks omitted). Gatien signed the bond as surety, pledged her home, and became jointly and severally liable for $2 million. Doc. 57; Doc. 289 at 2–3, 11. The proceedings to enforce or discharge her obligations are ancillary to, but distinct from, the criminal prosecution.

Gatien was, in every practical sense, a party to the bond agreement and the subsequent proceedings. She moved to be released from the bond, briefed the issue, and testified. Docs. 185, 195, 206, 208. At the outset of the hearing, the Surety's counsel explained that although she was "not a party to the underlying criminal matter," she "is a party to the bond agreement." Oct. 29, 2025 Hr'g Tr. at 11–12. The government agreed that she was "perfectly entitled to present evidence on her behalf." *Id.* at 18. Descalzo objected that Gatien "is just the surety," *id.* at 14, and argued the next day that the case had only "three parties," but the Court overruled her, observing that Descalzo had "brought up the reason why she's withdrawing as a surety, so that would seem to impact or involve her interest." Oct. 30, 2025 Hr'g Tr. at 62–63. The excess proceedings at issue were proceedings on the Surety's own motion, and the costs they generated fell on her; the Court later resolved that motion in her favor. Docs. 289, 293. Having targeted the Surety's motion and credibility, Descalzo cannot now deny the Surety's interest in the costs that conduct imposed.

**B. Descalzo Engaged in Objectively Unreasonable and Vexatious Conduct Tantamount to Bad Faith.**

The Surety does not contend that every question Descalzo asked was sanctionable. Defense counsel is entitled—indeed, obligated—to test a witness whose testimony may result in her client's detention. But zealous advocacy does not include telling a court things counsel knows are untrue, or building a cross-examination around a premise counsel privately rejects. Section 1927 reaches an attorney who "knowingly or recklessly" advances such positions. *See Amlong*, 500

F.3d at 1241; *Schwartz*, 341 F.3d at 1225. Four core episodes meet that standard on their own because each rests on facts within Descalzo's personal knowledge, not on a dispute about inferences or credibility. The Reeves custodianship, the altered text message, the privilege assertion, and the gold questioning reinforce them. And the totality of the record—which the Court may consider, *In re Engle Cases*, 283 F. Supp. 3d at 1224–25—shows that those episodes were part of a consistent effort to discredit the Surety with a narrative Descalzo knew to be false. Descalzo's statements outside the courtroom—her September 30, 2025, email to the government and her messages to the Surety—are cited not as conduct that multiplied these proceedings, and not for the truth of her characterizations, but as evidence of what she knew when she took contrary positions before this Court.

#### 1. The Categorical Denial That Any Agreement Existed Was Contradicted by Descalzo's Own Knowledge.

Descalzo did not merely dispute how the arrangement should be labeled. She denied that any agreement existed at all, and she disclaimed any knowledge of it. When the government advised her on September 30, 2025, that it intended to move to reopen detention based on "[t]he side agreement between Gatien and Goudreau," Descalzo responded: "I really don't know what she is talking about. There was no side agreement." Doc. 238-28. Nine days later, she told the Court that there was never "an undisclosed side agreement" and that the asset discussions were "not a formal agreement or a side agreement or anything other than a discussion by two people that had a personal relationship." Doc. 192 at 1. At the hearing, she pressed the same position on cross-examination, suggesting

that there "wasn't a contract" and then repeatedly asking whether "[a]ll you have to say that there was this side agreement is this e-mail" and whether "all you have that supports that agreement is that text message." Oct. 29, 2025 Hr'g Tr. at 146–48. That examination, and her later concession that she had attended the call at which the arrangement was discussed, are addressed in Part B.2 below.

Descalzo may contend that she denied only the government's characterization of "an undisclosed side agreement between the Defendant and his surety Ms. Gatien that would have made Ms. Gatien whole if the Defendant fled." Doc. 192 at 1 (quoting Doc. 187 at 1). The record forecloses that reading. Her September 30 email did not quarrel with the government's characterization; it disclaimed any knowledge of what the Surety was "talking about." Doc. 238-28. Her October 9 response went well beyond the government's phrasing, denying that the asset discussions were "anything other than a discussion by two people that had a personal relationship," and describing the arrangement as one in which "Ms. Gatien would hold Mr. Goudreau's personal property"—omitting that Goudreau's property was to be, and was, held in Descalzo's own safe. Doc. 192 at 1; Oct. 29, 2025 Hr'g Tr. at 94–95.

Descalzo's own knowledge contradicted each of those positions. Docs. 238-1, 238-2, 238-3, 238-4, 238-5. She was not a bystander to the arrangement; she was its designated custodian. Gatien testified that Descalzo was to hold the crypto and collateral and was initially given custody of the wallet. Oct. 29, 2025 Hr'g Tr. at 40, 46–47, 154–56. Descalzo confirmed the arrangement by text message. Doc. 238-1. When Gatien wrote in November 2024 that she wanted "to know the agreement

we made to secure bond is being upheld," Descalzo did not deny any agreement; she replied, "Hi, I have Jordan's stuff at my safe at home." Oct. 29, 2025 Hr'g Tr. at 93–95. And Descalzo sent her confirming message on the eve of the bond hearing, *before* Gatien pledged her home. Oct. 29, 2025 Hr'g Tr. at 45–46, 146.

On the ensuing Zoom call, in which Descalzo participated, Goudreau can be heard stating that he would give his lawyer his crypto and "I can't get to my Bitcoin because Marissel has the key," evidencing her custodianship. Oct. 30, 2025 Hr'g Tr. at 44–46. Until their October 2025 filings, neither Goudreau nor Descalzo had ever challenged the existence of the arrangement. Doc. 208 at 4. A reasonable attorney with that knowledge would not have told the government she did not know what the Surety was "talking about," told this Court the discussions were merely personal, and then questioned the Surety as though the only evidence were a single text message. Descalzo thereby put the Surety to the expense of proving the arrangement through a detailed reply and hearing testimony. Doc. 208.

Nor did the denial serve any legitimate purpose on the bond question. Collateral arrangements between a defendant and his surety are commonplace and are not a ground for denying release. Acknowledging the arrangement would have cost Goudreau nothing, and Descalzo herself told the Court that the subject did not "go[] to flight, danger to the community or danger to the person." Oct. 30, 2025 Hr'g Tr. at 12. The only work the denial performed was to cast the Surety as a fabricator and to force her to prove what Descalzo already knew.

**2. The Zoom-Call Questioning Was Contradicted by Descalzo's Own Participation in the Call.**

Descalzo cross-examined Gatien in a manner implying that the November 13, 2024, Zoom call, and indeed any negotiations regarding collateral, had not occurred. Oct. 29, 2025 Hr'g Tr. at 146–49. Descalzo asked, "All you have to say that there was this side agreement is this e-mail?" *Id.* at 147. Gatien responded: "Are you for real right now? We have the Zoom. We have everything. Marissel, you negotiated this." *Id.* Undeterred, Descalzo kept pressing Gatien's supposed lack of evidence. *Id.* at 146–49. Descalzo did not need Gatien's testimony to know whether that call happened: she was on it, and she took part in negotiating the very arrangement she later denied. On the recording, Descalzo stated, "I'm just here to facilitate for Jordan to somehow keep his bond," and Gatien responded, "which is securing the bond, that's what we had on the table from the beginning." Doc. 238, Ex. 35. Once the recording surfaced, Descalzo opposed its admission. Oct. 30, 2025 Hr'g Tr. at 11-13, 43-46. Nevertheless, the recording was admitted over objection. *Id*. at 46. Only then did Descalzo concede, "I was on the call." *Id*. at 67–68. An attorney may test a witness's account, but a reasonable attorney may not invite the factfinder to doubt the existence of an event she personally attended, much less a negotiation in which she participated. That questioning required the Surety to locate and present corroborating evidence of a fact that was never genuinely in dispute.

**3. Descalzo Recast the Surety's Efforts to Protect Her Home as a Domestic Dispute Despite Her Own Knowledge to the Contrary.**

Counsel may argue a witness's motive and bias, but this ground rests on specific factual misrepresentations to the Court, on which Descalzo built extended examination. She pressed the "domestic dispute" theory across her filings, her exhibits, and her examination of the Surety. On September 30, 2025, she told the government that Gatien's motion to surrender the bond agreement was "a family dispute more than anything else." Doc. 238-28. On October 9, 2025, she told the Court that she had been "unwillingly dragged into these disputes," which she called "domestic disputes that have no place here," and that the Surety's warnings were "statements born of anger and resentment." Doc. 192 at 2, 4–5, 9. She annotated the Surety's own text messages, in which Gatien pleaded for help to avoid losing her home, with the commentary that "[e]ven in these messages, Ms. Gatien is making threats and giving ultimatums." Doc. 192 at 6; Doc. 238-14.

Descalzo made those representations with full knowledge of the record to the contrary. In response to Reeves no longer permitting Goudreau to live in his home, she had written to the Surety that Goudreau "takes advantage of everyone!" Doc. 238-10. When Gatien texted her that the agreement that Descalzo made to keep custody of Goudreau's crypto wallet had been violated, she responded that "[a]ll of this is his own doing." Doc. 238-4. She had received the Surety's July 1, 2025, messages that she had to call someone "to not lose my home." Doc. 238-14; Oct. 29, 2025 Hr'g Tr. at 66–67. The Surety had brought in Colonel Reyes and remained on the bond so that Goudreau could get treatment through the VA. Oct.

29, 2025 Hr'g Tr. at 58. She had been offered, on September 17, 2025, the opportunity to seek the Surety's removal on the Defendant's own terms, an offer made expressly "to minimize any prejudice to the Defendant." Doc. 185 ¶ 1. She had received the Woolems' September 27, 2025, notice that Goudreau had pressured them to make "untrue statements." Doc. 238-31 at 3–5. And she had been the target of the same abuse herself: Goudreau refused to pay her, claimed "she just wants money," referred to her in derogatory terms, and sought to fire her. Docs. 238-4, 238-5, 238-6, 238-9.

A surety acting out of "anger and resentment" does not keep her home on the line so that the defendant can enter a VA program, invite his counsel to frame the surety's removal in his favor, and file her own motion only after he seeks false statements against her. Counsel who knew all of this could not, consistent with her duty of candor, tell the Court that the Surety's warnings were nothing more than the product of "anger and resentment." Doc. 192 at 9. Descalzo carried the same theory into her examination with the "trigger" questioning. After the Court saw messages in which Goudreau told the Surety to "fuck off," and heard her testify that he told her to "leave the bond and fuck off," Descalzo asked the Surety whether she "trigger[s]" his outbursts. Oct. 29, 2025 Hr'g Tr. at 75, 125. Descalzo did not ask that question in ignorance. She acknowledged on the record that Goudreau directed the same language at her, *id.* at 125–26, and she had privately written that his conduct was "his own doing." Doc. 238-4. Having written those words, she could not in good faith blame the Surety for the conduct she was warning about.

Subsequent events confirmed what Descalzo already knew. Goudreau absconded, and the Court, in findings to which Descalzo never objected, found that Goudreau had threatened to compile "false and defamatory declarations from third-party witnesses" against Gatien—the very conduct the Woolems had reported to Descalzo before she called Gatien's allegations "statements born of anger and resentment." Doc. 289 at 11–12; Doc. 238-31 at 3–5; Doc. 192 at 9. The Court found that "Gatien went above and beyond her duties as a surety" and that she "would have sought to remove herself as surety well before Goudreau's escape" but for his threats. Doc. 289 at 14. The Court acknowledged that the friendship had ended with "a great deal of acrimony," but it concluded that Goudreau's animosity made forfeiture of her collateral a means of "satisfy[ing] his own personal vendetta" against *her*. *Id*.

**4. Descalzo Pressed for the Release of Firearms to an Unverified Courier and Then Blamed the Surety.**

After Brande Woolems told Descalzo on September 27, 2025, that Goudreau's belongings had to be removed from the Woolems' Oklahoma home, Descalzo handled the retrieval personally, writing on October 16 that the Woolems should "turn over the rifles" to the driver and that "I have the driver standing by." Doc. 238-31 at 1–2. The driver arrived unannounced, in an Uber, gave a false name, and refused to show identification. Oct. 30, 2025 Hr'g Tr. at 85, 93, 118, 127, 131; Doc. 238-33 ¶ 20. She carried a letter from "Go Fast Production, LLC," purportedly a Florida moving company, that listed its address as 8501 Temple Terrace Highway, Tampa—the James A. Haley VA facility where Goudreau was living.

Docs. 238-22, 238-27. GoFast Productions LLC is Goudreau's own film company, public records list its principal address in Phoenix, Arizona, and the driver testified that the letter was "AI generated." Doc. 238-26; Oct. 30, 2025 Hr'g Tr. at 127–31.

Goudreau was barred from possessing firearms as a condition of his release. Doc. 58. After the Woolems withheld the rifles on the FBI's guidance, Oct. 30, 2025 Hr'g Tr. at 115–16, Descalzo pressed for their release anyway. She had arranged the pickup herself: "As directed, Mr. Goudreau and I coordinated to send someone to pick up his property in Oklahoma." Doc. 238-29 at 2. When the government asked what was happening, she asked the government to "instruct Ms. Wooloms . . . to give the driver all of Mr. Goudreau's property." *Id*. at 2–3. Asked who would keep the firearms, a question she was uniquely positioned to answer, she refused, citing "my duties to my client," and stated: "I was the one that emailed her about the driver, and I asked her to turn over everything." *Id*. at 1. At the hearing, she suggested that the rifles could have been going to a third-party custodian, the destination she had refused to identify to the government. Oct. 30, 2025 Hr'g Tr. at 92. She also examined witnesses on the theory that the controversy grew out of the Surety's soured relationship with Goudreau. *Id*. at 93. That theory obfuscated the origins and circumstances of the transfer and shifted the focus away from Descalzo's own role in it. Oct. 30, 2025 Hr'g Tr. at 110–13. Counsel who coordinated that pickup could not reasonably blame it on Gatien, and pressing for the release of firearms to an unverified third party with the use of an AI generated

letter was objectively reckless. That plan put Gatien's collateral at risk, forcing her to raise the matter with the Court at additional expense. Doc. 206.

**5. The Totality of the Record Shows a Pattern of Knowing Misdirection, Not Good-Faith Mistakes.**

A pattern of knowing misdirection runs through Descalzo's representations to the Court. Descalzo told the Court that "[e]xcept for one solitary incident, Mr. Goudreau has complied with all terms of his pre-trial release." Doc. 192 at 2. The exception she did not describe was the episode in which Goudreau told his court-approved custodian to "fight me or fuck off," ending the custodianship, an episode Goudreau himself confirmed on a recording with "Yes, I did. So what?" Oct. 29, 2025 Hr'g Tr. at 68–69; Oct. 30, 2025 Hr'g Tr. at 47–50. Descalzo knew by April 9, 2025, that Reeves had moved Goudreau's belongings to his garage and told him he was "never allowed in my home." Doc. 238-10; *see also* Oct. 30, 2025 Hr'g Tr. at 78–79. Weeks later, she moved to permit Goudreau to reside at the VA, representing that the government did not oppose the modification "provided that . . . at the conclusion of the program, he return to the original conditions." Doc. 163 ¶ 12. She did not tell the Court, or the government, that those conditions—residence with Reeves as custodian—could no longer be met. The Court granted the motion, relieving Reeves only temporarily, and ordered that "[u]pon Defendant's completion of the program, Defendant's release conditions shall revert to those originally imposed on him." Doc. 165. Given the circumstances, such a reversion was impossible and Descalzo knew it.

Descalzo also altered the plain wording of a text message by omission in order to cast Gatien as a liar. During her cross-examination of Brande Woolems she read: "Ms. Gatien writes you and says, 'I made up a reason for Jordan to call me by saying he might flee.'" Oct. 30, 2025 Hr'g Tr. at 105–06. The full text stated: "Basically Marissel filed saying that I made up a reason for Jordan to call me by saying he might flee and that— get this— there is no crypto wallet and he has zero assets. They say I am just upset that he wants nothing to do with me. The truth will come out." Doc. 238-23 at 70. By dropping "Marissel filed saying that," Descalzo turned the Surety's description of Descalzo's own filing into an apparent confession of improper motivation. The Surety's counsel objected that Descalzo was misrepresenting the document. Oct. 30, 2025 Hr'g Tr. at 105–06. Unable to view the exhibit, the Court instructed Descalzo that she "will have to remain true to the exhibit," explaining that it was "going to trust that you recite these things accurately" and that "[i]f I find out later on that will just detract from your credibility." *Id* at 108–09. Descalzo answered, "Absolutely, Your Honor. I understand," but did not correct her reading. *Id.* at 109.

The privilege objection fits the same pattern. When the Surety offered a communication among Descalzo, Gatien, and Goudreau about securing the bond, Descalzo objected that it was privileged. She disclaimed spousal privilege after first suggesting some form of marital relationship between Gatien and Defendant, Oct. 29, 2025 Hr'g Tr. at 41-42, and invoked attorney-client and "joint defense" privilege on the theory that Gatien shared a "common interest" in "the property that she's after." *Id.* at 89–90. The Court offered her the opportunity to file

supporting authority by the next morning. *Id.* at 89–92, 175–77. She filed nothing. She told the Court she "did not find any good case law to support my argument or my assertion," waived it, and conceded that no privilege applied. Oct. 30, 2025 Hr'g Tr. at 4–6. The objection thus targeted the very collateral discussions Descalzo had denied, and it "needlessly obstruct[ed]" the Surety's presentation.

So does the gold episode. Descalzo cross-examined Gatien at length about Goudreau's gold coins, including their location and whether Gatien kept any, and suggested that a receipt for gold had "magically appeared" on Gatien's computer. Oct. 30, 2025 Hr'g Tr. at 30–33. Yet Gatien had personally delivered ten ounces of that gold to Descalzo. *Id.* at 30–32; Doc. 238-9. Having made the gold an issue of Gatien's credibility, Descalzo could not reasonably pursue it while concealing that she held part of that gold.

Standing alone, any one of these positions might be defended as aggressive advocacy; together, they form a pattern. Descalzo denied a collateral arrangement she had confirmed in writing; questioned whether a call she attended had occurred; told the Court the Surety's warnings were the product of a failed relationship when her own words blamed her client; blamed the Surety for a firearms transfer Descalzo coordinated; allowed the Court to order a reversion to a custodianship she knew had ended; read the Surety's text as a confession by omitting that it described Descalzo's own filing; asserted a privilege she conceded the next day had no support; and examined the Surety about gold she herself held. Throughout, she presented the Court with an account of the Surety, and of Goudreau, that her own knowledge contradicted.

That is objective recklessness, at a minimum, and it is the conduct § 1927 exists to address. And the testimony Descalzo worked to discredit proved accurate: as the Court concluded, "it is reasonable to assume that Goudreau's animosity towards Gatien was only exacerbated by her hearing testimony . . . and severely undercut his claims that he should remain on bond." Doc. 289 at 14.

**C. Descalzo's Conduct Multiplied the Proceedings.**

The second element of § 1927 requires that the attorney's conduct actually multiplied the proceedings. *Schwartz*, 341 F.3d at 1225. The Surety does not contend that the bond hearing would not have occurred. But Descalzo had herself moved to remove the Surety, Docs. 176, 180, and at the outset of the hearing she told the Court that the defense did "not oppose the motion to remove her as a surety. We filed first." Oct. 29, 2025 Hr'g Tr. at 14. By her own account, the collateral arrangement did not bear on flight or danger. Oct. 30, 2025 Hr'g Tr. at 12. Had Descalzo acknowledged the arrangement she had helped administer, the Surety's release would have required little contested evidence. Instead, a substantial portion of a hearing that spanned more than two days was consumed by disputes that existed only because Descalzo denied facts within her own knowledge. The Surety incurred the following work, caused by specific episodes:

The categorical "no side agreement" denial and attacks on Gatien's credibility and motivations required her to seek leave to reply and to prepare and file the reply. Doc. 208. That required extensive review of her documents evidencing the arrangement and her prior discussions with Descalzo and Goudreau, and hearing testimony establishing the same facts—work that would

have been unnecessary had Descalzo acknowledged discussions in which she participated. The Zoom-call questioning consumed substantial hearing time and required counsel to locate, present, and argue for the admission of the recording on October 30 to prove an event Descalzo had attended. The domestic-relationship and "trigger" theory required the Surety to marshal rebuttal evidence, including the recording in which Goudreau confirmed his threat to his custodian, Doc. 238, Ex. 36, and to answer a narrative that Descalzo's own knowledge contradicted. The firearms episode required the Surety to defend her collateral and warn the Court of the planned transfer of firearms. Doc. 206. And the gold-coin questioning required Gatien to defend her credibility on a subject about which Descalzo held undisclosed, firsthand information.

The unsupported privilege objection also required the Surety's counsel to prepare overnight for briefing the Court ordered and that Descalzo then did not file. Oct. 29, 2025 Hr'g Tr. at 175–77; Oct. 30, 2025 Hr'g Tr. at 4–6. This work is identifiable and severable from the cost of the hearing. *See Peterson*, 124 F.3d at 1396. The Court's own interventions confirm that Descalzo's examination caused excess hearing time. When Descalzo defended her questioning as showing "the pattern of the way that these two people communicated and fought," the Court asked her to keep it "in an area that has some relevance to the subject." Oct. 29, 2025 Hr'g Tr. at 165–66. The next day, the Court announced that "we are not going to have a five-day hearing" and that it would be "tighter on how much latitude I allow" because "that's not the way things went yesterday." Oct. 30, 2025 Hr'g Tr. at 18–19. Later that day, it told her she "need[ed] to move on," sustained its own

"[a]sked and answered" objection, and cautioned her for "inserting yourself into this matter as a witness." *Id.* at 35–36, 40, 101.

**D. The Requested Fee Award Is Limited to Fees and Expenses Caused by the Excess Proceedings.**

The Surety seeks only those attorney's fees directly attributable to the excess proceedings caused by Descalzo's conduct. Section 1927 limits recovery to "excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927; *see also Amlong*, 500 F.3d at 1242; *Peterson*, 124 F.3d at 1396. The Surety requests $31,439.38 in excess fees, calculated at counsel's hourly rate of $425 and supported by the declaration of counsel addressing the reasonableness of the rate and the time expended. Ex. 1. The Surety excludes all time spent on her original motion and on the proceedings that followed Goudreau's flight, rounds the pre-hearing hours down, and claims only a fraction of the hearing itself.

Separately, the Surety requests $27,500.00, the flat fee she paid to bring this motion, which would have been unnecessary but for the conduct described above. The Surety requests those amounts under § 1927 and, in the alternative, under the Court's inherent authority. Should the Court require further detail on any component, the Surety requests leave to submit billing records in support.

**E. Alternatively, the Court Should Exercise Its Inherent Authority to Sanction Bad-Faith Litigation Conduct.**

If the Court concludes that any portion of this conduct falls outside § 1927, the Surety asks the Court to exercise its inherent authority in the alternative. "In the absence of direct evidence of subjective bad faith, this standard can be met if an attorney's conduct is so egregious that it could only be committed in bad faith."

*Purchasing Power*, 851 F.3d at 1224–25. This is not a case of counsel advancing a client's account she had no means to verify. On the eve of the bond hearing, when the Surety wrote that she wanted "something agreed-upon before court," Descalzo replied, "You are just going to keep his stuff." Doc. 238-1; Oct. 29, 2025 Hr'g Tr. at 45–46. In November 2024, when the Surety asked whether "the agreement we made to secure bond is being upheld," Descalzo answered, "I have Jordan's stuff at my safe at home." Oct. 29, 2025 Hr'g Tr. at 93–95. On the Zoom call that followed, Descalzo told the Surety she was there "to facilitate for Jordan to somehow keep his bond," and the Surety answered that securing the bond was "what we had on the table from the beginning." Doc. 238, Ex. 35. Yet on September 30, 2025, she told the government, "I really don't know what she is talking about. There was no side agreement," Doc. 238-28, and nine days later she told this Court the discussions were merely personal, Doc. 192 at 1. Only when confronted with the recording did she concede, "I was on the call." Oct. 30, 2025 Hr'g Tr. at 68. She then called the Surety's warnings the product of "anger and resentment" after receiving the Surety's offer to proceed on the Defendant's terms and the Woolems' written notice that Goudreau was soliciting false statements. Doc. 192 at 9; Doc. 185 ¶ 1; Doc. 238-31 at 3–5. A lawyer who knows the truth and represents the opposite to a court acts with knowledge, not mere recklessness.

## REQUESTED RELIEF

WHEREFORE, Jennifer Gatien respectfully requests that the Court: (1) order Marissel Descalzo to show cause why sanctions should not be imposed under 28 U.S.C. § 1927 or, in the alternative, the Court's inherent authority; (2) upon finding

sanctions warranted, award Jennifer Gatien $31,439.38 in excess attorney's fees attributable to the conduct described above; (3) separately award Jennifer Gatien $27,500.00 in attorney's fees incurred in bringing this motion; (4) to the extent the Court deems it necessary, find this motion timely or, alternatively, relieve the Surety of any applicable deadline under Local Rule 1.01(b), Federal Rule of Civil Procedure 6(b)(1)(B), and Federal Rule of Criminal Procedure 45(b)(1)(B); (5) to the extent the Court requires further detail, permit the Surety to file billing records or a supplemental fee petition, in the alternative, if Rule 7.01 applies; and (6) grant such further and additional relief as the Court deems just and proper.

Dated: October 30, 2026

Respectfully submitted,

/s/ Gerald A. Urbanek, Jr.

Gerald A Urbanek, Jr., FBN 1032592
BINNALL LAW GROUP
717 King Street, Suite 200
Alexandria, Virginia 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
gerald@binnall.com
Counsel for Jennifer Gatien

## LOCAL RULE 3.01(g) CERTIFICATION

In accordance with Local Rule 3.01(g), undersigned counsel has met and conferred with Marissel Descalzo, via email, who opposes this motion.

Dated: October 30, 2026

/s/ Gerald A. Urbanek, Jr.
Gerald A. Urbanek, Jr.

*Counsel for Jennifer Gatien*

## CERTIFICATE OF SERVICE

I certify that on October 30, 2026, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

/s/ Gerald A. Urbanek, Jr.
Gerald A. Urbanek, Jr.

*Counsel for Jennifer Gatien*